**UNITED STATES of America,**
**Appellee,**

v.

**Elizabeth SANDERS; James Sanders,**
**Defendants–Appellants.**

**Docket Nos. 99–1430, 99–1431**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 9, 2000

Decided: May 4, 2000

J. Bruce Maffeo, New York City, for Appellant James Sanders.

Jeremy Gutman, New York City, for Appellant Elizabeth Sanders.

David Pitofsky, Assistant United States Attorney, Eastern District of New York, Brooklyn, N.Y. (Loretta E. Lynch, United States Attorney, Emily Berger, Assistant United States Attorney, Eastern District of New York, Brooklyn, NY, of counsel), for Appellee.

Before: MESKILL and SOTOMAYOR, Circuit Judges, and KEENAN,* District Judge.

MESKILL, Circuit Judge:

Defendants-appellants James and Elizabeth Sanders were convicted by a jury in the United States District Court for the Eastern District of New York, Seybert, *J.*, of conspiring to remove, without authority, parts or property from a civil aircraft that has been involved in an accident and of aiding and abetting the same. On appeal, they present five arguments: (1) the prosecution was vindictive, (2) the prosecution impermissibly burdened a First Amendment right to protect the confidentiality of a news source, (3) the material removed was *de minimis*, (4) the evidence was insufficient to support the verdict against Elizabeth Sanders, especially viewed *strictissimi juris*, and (5) the jury should have been instructed to acquit absent a finding of "wrongful intent." Finding no merit to these arguments, we affirm.

## BACKGROUND

On July 17, 1996 TWA Flight 800 exploded over the Atlantic Ocean shortly after takeoff, killing all 230 persons on board. The government undertook a massive salvage effort to recover as much of the wreckage as possible, in an attempt to

---

* Honorable John F. Keenan, United States District Judge for the Southern District of New York, sitting by designation.

determine the cause of the disaster. The wreckage was transported to a secured facility in Calverton, NY, where it was identified, if possible, catalogued and stored. Numerous government agencies were involved in the investigation, including the Federal Bureau of Investigation (FBI) and the National Transportation Safety Board (NTSB).

While the official investigation was proceeding, there was considerable speculation in the media and the public as to the cause of the disaster. Numerous explanations were put forward, including a theory that the plane had been struck by a missile. *See, e. g.,* Asra Q. Nomani, *et al.,* "Airlines: After the Crash, More Questions Than Answers," Wall St. J., July 19, 1996, at B1. James Sanders, an investigative journalist, decided to investigate the incident. Through his wife Elizabeth, a senior TWA flight attendant, he made contact with Capt. Terrell Stacey, TWA's senior 747 pilot and a participant in the official investigation.

According to Capt. Stacey's testimony at trial, he received a phone call from Mrs. Sanders sometime in the fall of 1996. She suggested that he meet with Mr. Sanders, who might be able to help "find out exactly what happened to Flight 800 and get it before the American public." After some initial reluctance, Capt. Stacey agreed to meet in confidence with Mr. Sanders. Capt. Stacey and Mr. Sanders met four times between November 1996 and February 1997. They spoke regularly by telephone.

During one of their phone conversations, Capt. Stacey described a reddish residue that had been found on some of the seats recovered from the wreckage. Mr. Sanders stated that "if it came out positive for explosive residue, then it would [be a] 'slam dunk' as far as being absolute proof that some outside force affected the airplane." Mr. Sanders asked Capt. Stacey to obtain a sample of the residue for testing by a private laboratory. Capt. Stacey demurred. He explained that "we had

been warned many times to maintain [the] confidentiality of the investigation and we knew we weren't supposed to take anything out of the [Calverton facility]." Over the next few weeks Mr. Sanders made a number of attempts to contact Capt. Stacey, who had not yet decided whether or not to take the sample. At one point, Mrs. Sanders called Capt. Stacey, urging him to take the sample. Capt. Stacey ultimately did so, removing several strips of styrofoam, measuring approximately 1" × 3", from the back of two seats. The parties disagree as to whether Capt. Stacey removed the samples before or after receiving Mrs. Sanders' call.

On March 10, 1997, a front-page article in the Riverside, California *Press–Enterprise* reported on Mr. Sanders' investigation and his theory that Flight 800 had been struck by a United States Navy missile. The article identified Mr. Sanders as an "author and investigative reporter" and revealed that Mr. Sanders, through a confidential source, had obtained samples of residue from the wreckage that were consistent with the presence of solid rocket fuel. The article also disclosed that Mrs. Sanders was a TWA employee. Mr. Sanders' book, *The Downing of TWA Flight 800,* was published the following month.

Immediately after the publication of the *Press–Enterprise* article, the FBI attempted to question Mrs. Sanders. The United States Attorney for the Eastern District of New York also obtained a grand jury subpoena for Mr. Sanders' telephone records, without obtaining the authorization of the Attorney General or otherwise complying with Department of Justice policy in dealing with members of the media. *See* 28 C.F.R. § 50.10 (1999).

Shortly thereafter, an attorney representing Mr. and Mrs. Sanders contacted Assistant United States Attorney Benton Campbell and offered to accept communications or service of process on their behalf. In response, Mr. Campbell offered to enter into a non-prosecution agreement with Mr. Sanders in exchange for the dis-

closure of his confidential source. Mr. Sanders declined, expressing his belief that he had not committed any crime and that he was entitled to preserve the confidentiality of his news source. At a subsequent face-to-face meeting, Mr. Campbell, together with then-Chief of the Criminal Division Valerie Caproni, warned Mr. Sanders that he risked indictment if he refused to disclose his source and that Mrs. Sanders was also a target of the investigation and could be indicted as well.

In June 1997, the government identified Capt. Stacey as Mr. Sanders' source and secured his cooperation against Mr. and Mrs. Sanders by allowing him to plead guilty to a misdemeanor. An arrest warrant for Mr. and Mrs. Sanders issued in December 1997, charging them with violating 49 U.S.C. § 1155(b). Section 1155(b) prohibits the unauthorized removal, concealment, or withholding of "a part of a civil aircraft involved in an accident, or property on the aircraft at the time of the accident." The defendants moved to obtain discovery on claims of selective and vindictive prosecution. The district court denied the motions. *United States v. Sanders*, 17 F.Supp.2d 141 (E.D.N.Y.1998). The defendants then moved to dismiss the indictment, contending that they were the victims of selective and vindictive prosecution and that the information sought by the government was protected by the First Amendment. The district court denied those motions as well. The defendants were subsequently convicted by a jury. Mr. Sanders was sentenced to three years probation, with a special condition that he perform 50 hours of community service. Mrs. Sanders was sentenced to one year of probation, with a special condition that she perform 25 hours of community service. A special assessment of $200 was imposed on both defendants. Both sentences were stayed pending this appeal.

## DISCUSSION

### I. *Vindictive Prosecution*

The defendants first contend that their convictions should be dismissed because they were the victims of vindictive prosecution. In particular, they claim that they were prosecuted (1) to punish them for challenging the government's explanation of the disaster, and (2) to retaliate for their refusal to disclose their informant. The defendants also argue, if dismissal is not warranted, that the district court erred in denying them discovery on the issue of vindictive prosecution. The Sanders do not pursue the selective prosecution claim on appeal.

■ As an initial proposition, "the decision as to whether to prosecute generally rests within the broad discretion of the prosecutor," *United States v. White*, 972 F.2d 16, 18 (2d Cir.1992), and a prosecutor's pretrial charging decision is presumed legitimate, *see id.* at 19. However, "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort," *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), and a prosecution brought with vindictive motive, "'penalizing those who choose to exercise' constitutional rights, 'would be patently unconstitutional.'" *North Carolina v. Pearce*, 395 U.S. 711, 724, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (quoting *United States v. Jackson*, 390 U.S. 570, 581, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)). "Accordingly, an indictment will be dismissed if there is a finding of 'actual' vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir.1999) (per curiam).

■ To establish an actual vindictive motive, a defendant must prove objectively that the prosecutor's charging decision was a "direct and unjustifiable penalty," *United States v. Goodwin*, 457 U.S. 368, 384 & n. 19, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), that resulted "solely from the defendant's

exercise of a protected legal right," *id.* at 380 n. 11, 102 S.Ct. 2485. *See also Johnson*, 171 F.3d at 140–41. Put another way, the defendant must show that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus." *United States v. Koh*, 199 F.3d 632, 640 (2d Cir.1999) (internal quotation marks omitted).

■ To establish a presumption of prosecutorial vindictiveness, the defendant must show that "the circumstances of a case pose a 'realistic likelihood' of such vindictiveness." *United States v. King*, 126 F.3d 394, 397 (2d Cir.1997) (quoting *Blackledge v. Perry*, 417 U.S. 21, 27, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974)). The circumstances must present a realistic likelihood of vindictiveness that would be "applicable in all cases," *Goodwin*, 457 U.S. at 381, 102 S.Ct. 2485, and any such presumption may be "overcome by objective evidence justifying the prosecutor's action," *id.* at 376 n. 8, 102 S.Ct. 2485. A presumption of vindictiveness generally does not arise in a pretrial setting. *Koh*, 199 F.3d at 639–40.

■ We have not previously considered when a defendant is entitled to discovery on a claim of vindictive prosecution. However, to obtain discovery on a claim of selective prosecution, we have held that a defendant must provide "some evidence tending to show the existence of the essential elements of the defense." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974) (quoted in *United States v. Armstrong*, 517 U.S. 456, 468, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)). The standard is a "rigorous" one, *Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480, "itself . . . a significant barrier to the litigation of insubstantial claims," *id.* at 464, 116 S.Ct. 1480. We see no reason to apply a different standard to obtain discovery on a claim of vindictive prosecution. *Accord United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir.1990). Whether a defendant claims selective prosecution or vindictive prosecution, " '[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.' " *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480 (quoting *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). We review a district court's decision denying discovery on such claims only for abuse of discretion. *United States v. Fares*, 978 F.2d 52, 59 (2d Cir.1992).

■ We agree with the district court that the defendants failed to establish actual vindictiveness because they failed to offer evidence of any "genuine animus" motivating the prosecution. The evidence offered by the defendants shows, at most, that certain persons and government agencies involved in the Flight 800 investigation disagreed with the defendants' explanation for the disaster. *See Sanders*, 17 F.Supp.2d at 146–50. In no way does the evidence show that the prosecution was brought to punish the defendants or to retaliate against them for exercising their rights. Consequently, the defendants were properly denied discovery on their vindictive prosecution claim.

The defendants point principally to a press release announcing the criminal charges, to a letter offered by the government at sentencing, and to a hearsay statement recounted on the *NBC Nightly News*. The press release announcing the criminal charges stated, in pertinent part:

> The criminal complaint outlines efforts by JAMES SANDERS to have laboratory tests done on portions of the TWA 800 wreckage which he unlawfully possessed. An individual employed at the laboratory has informed the FBI that SANDERS emphasized his desire for the tests to identify the presence of

solid rocket propellant. The tests were conducted and provided no conclusive evidence of the presence of solid rocket fuel. These results were communicated to SANDERS.

According to the criminal complaint, despite the laboratory test results, JAMES SANDERS misrepresented those results in media reports for which he was a source.

Mr. KALLSTROM [then-Assistant Director in Charge of the New York FBI Office] stated, "This criminal investigation is far from over. These defendants are charged with not only committing a serious crime, they have also increased the pain already inflicted on the victims' families. This investigation will continue in an effort to identify any other individuals who may have played a role in this scheme."

The letter submitted by the government at sentencing refers to "the trauma visited upon the bereaved families of those who perished in the crash, whose grief was only exacerbated and prolonged by Mr. Sanders' dissemination of misinformation."

The defendants argue that these references to the suffering of the victims' families plainly do not refer to the unauthorized removal of small pieces of wreckage, but rather to the defendants' attempts to challenge the official explanation for the disaster. They conclude that the prosecution was brought to punish them for the latter, *i.e.*, for exercising First Amendment rights.

However, the press release and sentencing letter do not say anything about why the prosecution was brought, much less indicate that "genuine animus" motivated the decision to prosecute. It would be too easy for defendants to obtain discovery on vindictive prosecution claims if all that was required was to identify a potential motive for prosecutorial animus. To warrant discovery, the defendant must show "some evidence" of "genuine animus," not the mere possibility that animus might exist under the circumstances.

Furthermore, press releases and sentencing materials regularly provide background information, such as the identity of the victims or the consequences of criminal activity, to better illustrate the nature of the crime. The press release and sentencing letter here did just that, explaining that the residue samples were obtained in an attempt to prove that TWA Flight 800 was struck by a missile. To the extent the defendants' opinions and writings caused pain to the victims' families, such pain was fairly attributable to the defendants' unauthorized removal of part of the wreckage. The recitation of this background information, however, is not evidence that the prosecution was brought because of the defendants' beliefs rather than because they committed the crimes charged. The other evidence cited by the defendants—including the hearsay statement that "more [conspirators] may have been involved in what [the FBI] calls a plot to rewrite the history of TWA 800," attributed to the FBI by the *NBC Nightly News*—also fails to show that the charges were motivated by "genuine animus."

■ The defendants argued before the district court that the chronology of events leading up to their indictment was evidence of the government's animus. *See Sanders,* 17 F.Supp.2d at 146–48. They pointed to "three triggering events" that allegedly gave rise to retaliation: the publication of the newspaper article implicitly accusing the FBI and NTSB of concealing evidence, the publication of the book continuing to probe the government's conduct, and Mr. Sanders' requests under the Freedom of Information Act for information about certain U.S. Attorneys and FBI agents. *Id.* at 147–48. Even assuming that the defendants were a thorn in the government's side, it does not follow that they were punished because they may have drawn blood. The fact that an aggressive investigation commenced immediately following publication of the newspaper article provides no evidence of such

vindictiveness, inasmuch as the article reported that Mr. Sanders claimed to have obtained "samples of the residue" and "pieces of one of the seats." *See id.* at 149. The article "clearly indicated a potential violation of 49 U.S.C. § 1155(b)," *id.*, so the government's decision to investigate cannot give rise to an inference of impropriety. There is nothing to suggest that the other alleged retaliatory acts were anything more than subsequent steps in the government's investigation into how Mr. Sanders had obtained the samples of residue and seat fabric.

Furthermore, the defendants cannot claim that the circumstances surrounding their case pose a "realistic likelihood" of vindictiveness. Such a presumption is not warranted merely because the government commenced criminal proceedings against somebody who challenged the findings of a government agency. *See Goodwin,* 457 U.S. at 384, 102 S.Ct. 2485 ("[A] mere opportunity for vindictiveness is insufficient to justify the imposition of a prophylactic rule."). More to the point, the government offered the defendants immunity if they would identify their informant, an offer that belies any supposed motive to punish them. In the circumstances of this case, the government's offer of immunity is persuasive evidence that the government was motivated by a legitimate desire to identify and eliminate a patent security breach in the official investigation, rather than by an illegitimate desire to silence an objectionable viewpoint.

■ A presumption of vindictiveness is also not warranted merely because a threat to prosecute was carried out after the defendants refused to divulge their source. It is precisely the responsibility of the prosecutor to weigh "the societal interest in prosecution" against the potential benefits from a defendant's cooperation. *See id.* at 382, 102 S.Ct. 2485; *see also Bordenkircher,* 434 U.S. at 362, 98 S.Ct. 663 (finding no vindictiveness in "the give-and-take negotiation common in plea bargaining between the prosecution and de-

fense" (internal quotation marks omitted)). That is why, for the most part, no presumption of vindictiveness is appropriate in a pretrial setting. *See United States v. Hinton,* 703 F.2d 672, 678–79 (2d Cir. 1983).

Absent any evidence that the prosecution was brought to punish the defendants or to retaliate against them for exercising their rights, the defendants were not entitled to discovery on the issue of actual vindictiveness. *A fortiori,* their defense of actual vindictiveness also fails. The defendants have not established that a presumption of vindictiveness is warranted. Therefore, their motion to dismiss on the basis of prosecutorial vindictiveness was properly denied.

## II. *Journalist's Privilege*

■ The defendants next contend that there is a journalist's privilege barring any government coercion to disclose a news source, "absent a concern so compelling as to override the precious rights of freedom of speech and the press." *See Baker v. F & F Inv.,* 470 F.2d 778, 785 (2d Cir.1972). They argue that we should adopt a balancing test weighing "the governmental interest served by prosecution" against "the detrimental impact of permitting such a prosecution to be used as a means of coercing disclosure of a journalist's source."

We decline. The defendants rely on a qualified journalist's privilege against compelled disclosure of confidential news sources that we first recognized in *Baker. Baker* (and its progeny) involved the power of a court to supervise its own compulsory discovery processes, whereas the case here involves the power of a prosecutor to decide when and on what terms to bring charges against a defendant. We hold that no journalist's privilege is applicable here.

In *Baker,* class action plaintiffs alleged that the defendants sold homes at excessive prices by engaging in racially discrim-

inatory practices such as "blockbusting." *Id.* at 780. They deposed Alfred Balk, a journalist who had written an article for the *Saturday Evening Post* titled "Confessions of a Block–Buster." The article was based on information supplied by a real estate agent who had asked to remain anonymous. Although Balk was "highly sympathetic" to the plaintiffs' cause, *id.*, he balked when asked to identify the real estate agent, and the plaintiffs moved for an order under Fed.R.Civ.P. 37 compelling an answer, *see id.* at 781. The district court refused to grant the motion, and we affirmed. Recognizing that "[a] motion seeking a discovery ruling is addressed to the discretion of the district court," we determined that the district court "was well within the ambit of [its] discretionary authority in denying [the] motion for discovery." *Id.* We explained that, "[a]lthough ... federal law does not recognize an absolute or conditional journalist's testimonial 'privilege,' neither does federal law require disclosure of confidential sources in each and every case, both civil and criminal, in which the issue is raised." *Id.* Instead, "courts ... must rely on both judicial precedent and a well-informed judgment as to the proper federal public policy to be followed in each case." *Id.* We concluded that the public and private interests in compelled testimony did not outweigh the "paramount public interest in the maintenance of a vigorous, aggressive and independent press," especially because the information sought might have been available from other sources. *See id.* at 782–83.

Following *Baker* our decisions dealing with the journalist's privilege have involved not only motions to compel under Fed.R.Civ.P. 37, but also motions to quash subpoenas issued in both civil and criminal cases. *See United States v. Cutler*, 6 F.3d 67, 71 (2d Cir.1993); *United States v. Burke*, 700 F.2d 70, 76–77 (2d Cir.1983); *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7–8 (2d Cir.1982). Just like motions to compel under Fed.R.Civ.P. 37, motions to quash are entrusted to the sound discretion of the district court. *See Logan v. Bennington College Corp.*, 72 F.3d 1017, 1027 (2d Cir.1995) (civil subpoena); *United States v. Caming*, 968 F.2d 232, 238 (2d Cir.1992) (criminal subpoena); *In re Grand Jury Matters*, 751 F.2d 13, 16 (1st Cir.1984) ("We review a district court decision to quash, or not quash, a grand jury subpoena, solely for abuse of discretion, with much deference being owed to the lower court's authority."). We find no comparable font of discretionary authority that would permit us to "balance" First Amendment interests here.

■ To the contrary, it is the prosecutor, not the court, who is vested with authority to decide whether to prosecute or to forgo prosecution in return for cooperation. "In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher*, 434 U.S. at 364, 98 S.Ct. 663. "Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480 (internal quotation marks omitted).

■ Of course, the prosecutor must act within the bounds of the Constitution. *See id.* at 464, 116 S.Ct. 1480. However, the First Amendment erects no absolute bar against government attempts to coerce disclosure of a confidential news source, *Branzburg v. Hayes*, 408 U.S. 665, 679–708, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), nor does it invalidate "every incidental burdening of the press that may result

from the enforcement of civil or criminal statutes of general applicability," *id.* at 682, 92 S.Ct. 2646. As explained earlier, the defendants have not shown that the prosecution was leveled with actual vindictiveness, in violation of their Due Process rights. To the contrary, the prosecution acted forthrightly in dealing with the defendants in this case, offering them immunity if they would identify the person or persons who violated a federal criminal statute by providing them with the samples of the residue and seat back fabric. We believe the offer was a legitimate exercise of "the broad discretion" entrusted to the prosecutor to weigh "the extent of the societal interest in prosecution" against the potential benefits of the defendants' cooperation, *see Goodwin*, 457 U.S. at 382, 102 S.Ct. 2485, and we hold that no journalist's privilege is applicable here.

### III. *Statutory Interpretation*

The defendants next argue that the "minuscule quantity" of residue involved cannot be considered "property" within the meaning of 49 U.S.C. § 1155(b) and that, in the alternative, section 1155(b) did not provide fair warning that the removal of such *de minimis* quantities would be illegal. We reject these arguments out of hand.

Section 1155(b) states:

A person that knowingly and without authority removes, conceals, or withholds a part of a civil aircraft involved in an accident, or property on the aircraft at the time of the accident, shall be fined under title 18, imprisoned for not more than 10 years, or both.

The statute, on its face, contains no exception permitting the *de minimis* removal, concealment, or withholding of parts or property from an airplane accident. As noted by the government, the recovered wreckage was subject to strict chain of custody procedures, in the event any of it was needed as evidence in a criminal proceeding. The unauthorized removal of even a *de minimis* amount could have seriously jeopardized the integrity of the ongoing investigation.

■ In any case, even if a *de minimis* exception exists—a question we do not answer today—it would not extend to the removal of parts or property that could be relevant to determining the cause of the crash. To hold otherwise would defeat the purpose of section 1155(b), which is to deter the thoughtless and occasionally malicious removal of aircraft wreckage "vital to the accident investigation." *See* H.R.Rep. No. 87–2487 (1962). Capt. Stacey testified that, according to Mr. Sanders, the residue might provide "slam dunk . . . absolute proof that some outside force affected the airplane." The fact that defendants obtained the samples in an effort to prove the cause of the crash clearly establishes that the material taken was the type of "property" covered by the statute.

■ The defendants also argue that section 1155(b) did not provide "fair warning" that the removal of such small quantities of material would be illegal. The "touchstone" as to whether a statute provides fair warning "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). We believe that section 1155(b), standing alone, is "reasonably clear" in prohibiting the defendants' conduct. A statute is not rendered vague or ambiguous simply because a defendant might speculate that an exception exists, when nothing in the statute suggests such an exception.

### IV. *Evidentiary Sufficiency*

■ Next, Mrs. Sanders claims that the evidence was insufficient to support her conviction, especially viewed *strictissimi juris*. The crux of her argument is based on one view of the evidence. According to Mrs. Sanders, the phone call she made to Capt. Stacey urging him to

obtain samples of the residue was made only after he had already taken the samples, notwithstanding his testimony that (1) the call was made while he was deciding whether or not to take the samples, and (2) he was influenced in his decision to take the samples by both Mr. and Mrs. Sanders. To support her argument, Mrs. Sanders relies on a series of inferences to establish when the phone call was made and when Capt. Stacey obtained the samples.[1] Mrs. Sanders contends that the government therefore proved neither the aiding and abetting charge, because it has not shown that her efforts contributed to the success of the crime, see *United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990), nor the conspiracy charge, because it has not shown that she had entered into an agreement to commit the crime, see *United States v. Wardy,* 777 F.2d 101, 107–08 (2d Cir.1985).

■ When challenging a conviction for insufficient evidence, the defendant bears a "heavy burden." *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997). The conviction must be affirmed "if, viewing all the evidence in the light most favorable to the prosecution, ... 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

■ However, Mrs. Sanders asserts that the sufficiency of the evidence against her must be judged *strictissimi juris.* "Courts use *strictissimi juris* only under very special circumstances." *United States v. Montour,* 944 F.2d 1019, 1024 (2d Cir.1991). As the Seventh Circuit explained:

When the group activity out of which the alleged offense develops can be described as a bifarious undertaking, involving both legal and illegal purposes and conduct, and is within the shadow of the first amendment, the factual issue as to the alleged criminal intent must be judged *strictissimi juris.* This is necessary to avoid punishing one who participates in such an undertaking and is in sympathy with its legitimate aims, but does not intend to accomplish them by unlawful means. Specially meticulous inquiry into the sufficiency of proof is justified and required because of the

1. Mrs. Sanders points out that Capt. Stacey was unsure exactly when the call occurred, but that he recalled only one instance when Mrs. Sanders had called him (aside from the initial call suggesting that he meet with Mr. Sanders). Phone company records showed only two calls from Mrs. Sanders' residence to the Holiday Inn where Capt. Stacey was staying: a two minute call on January 8, and a twenty minute call the evening of January 9, 1997: Mrs. Sanders posits that the two minute call on January 8 reached only the Holiday Inn switchboard, so the twenty minute call on January 9 must have been the phone call urging Capt. Stacey to take the samples. Mrs. Sanders next argues that Capt. Stacey obtained the samples during the day January 9, *i.e.,* before her phone call that evening. Records from the Calverton facility showed that Capt. Stacey left at 4:30 p.m. on January 9. Capt. Stacey testified that he called Mr. Sanders to inform him that he had taken the sample, and Capt. Stacey's phone records showed only one phone call to Mr. Sanders during the relevant time period—on January 9, after receiving Mrs. Sanders' phone call.

Furthermore, a January 10 email from Mr. Sanders supposedly confirms that Capt. Stacey sent the samples on or before January 9, because Mr. Sanders stated that he had the samples, which were sent by Federal Express.

Even if Mrs. Sanders' reconstruction of the events is accurate, the January 8 phone call would be enough to sustain her conviction. A reasonable jury could readily conclude that the January 8 phone call was made to persuade Capt. Stacey to take the samples. The phone call would thus show not only that she conspired to commit the crime, but also that her "efforts contributed to its success." *Labat,* 905 F.2d at 23. The requirement that one who aids and abets a crime must contribute to its success should not be understood too literally, inasmuch as it merely restates the requirements that one who aids and abets must have engaged in "a voluntary act or omission" with "the specific intent that [such] act or omission bring about the underlying crime." *See United States v. Zambrano,* 776 F.2d 1091, 1097 (2d Cir.1985). The January 8 phone call would satisfy both requirements.

real possibility in considering group activity, characteristic of political or social movements, of an *unfair imputation of the intent or acts of some participants to all others.*

*United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir.1972) (emphasis added). The doctrine does not require evidence "so compelling that a verdict of not guilty would be perverse," and it does not "wholly depriv[e] the jury of its customary function in interpreting ambiguous statements in the light of circumstances and choosing among reasonable inferences." *Id.* at 393.

We do not believe the *strictissimi juris* standard applies. Mrs. Sanders argues that, even though she made a phone call urging Capt. Stacey to take the samples, the call took place after he had already done so. Mrs. Sanders does not dispute that she made the phone call, and there is no question here of imputing intent or any other act to Mrs. Sanders to establish her participation in the crime. The sole issue here is whether the phone call was made before or after Capt. Stacey removed the samples, and as usual, it was the jury's prerogative to interpret ambiguous statements and to choose among reasonable inferences. The jury was entitled to credit Capt. Stacey's testimony that the phone call from Mrs. Sanders took place while he was deciding whether to take the samples, so the evidence was sufficient to establish that she entered into the conspiracy and aided and abetted the underlying crime.

## V. *Wrongful Intent*

■ Finally, the defendants argue that they were entitled to instructions requiring the jury to find "guilty intent" before the jury could convict. The defendants rely on *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), in which the Supreme Court held that a criminal intent element was implicit in certain federal crimes "incorporated from the common law." *Id.* at 262, 72 S.Ct. 240. The statute interpreted in *Morissette* sanctioned anyone who "embezzles, steals, pur-

loins, or knowingly converts . . . any record, voucher, money, or thing of value of the United States." *See id.* at 248 n. 2, 72 S.Ct. 240 (internal quotation marks omitted). The Court read a criminal intent requirement not only into the crimes that did not include an express *mens rea* element, but also into the crime of knowing conversion. *Id.* at 263–73, 72 S.Ct. 240. The defendants contend that a similar criminal intent element should be implied in section 1155(b), supplementing the knowledge requirement stated in the statute.

■ Contrary to the defendants' position, the Court recognized that the intent element was not a necessary element of every federal offense. *See id.* at 253, 72 S.Ct. 240 (referring to the "century-old but accelerating tendency . . . to call into existence new duties and crimes which disregard any ingredient of intent"). Furthermore, since *Morissette* it has become clear that knowledge may suffice for criminal culpability if "extensive enough to attribute to the knower a 'guilty mind,' or knowledge that he or she is performing a wrongful act." *See United States v. Figueroa*, 165 F.3d 111, 115–16 (2d Cir.1998).

The elements of section 1155(b) are the knowing, unauthorized removal of parts or property from a civil aircraft that has been involved in an accident. It is common knowledge that airplane crashes are the subject of exhaustive investigation and study by government agencies, so " 'one would hardly be surprised to learn' " that the unauthorized removal of parts or property from a crash site " 'is not an innocent act.' " *See id.* at 116 (quoting *United States v. Freed*, 401 U.S. 601, 609, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971)). One who knowingly removes parts or property from an airplane that had been involved in a crash has "sufficient knowledge to recognize that they have done something culpable." *Id.* at 118. Therefore the district court properly refused to instruct the jury that it must find an additional element of "wrongful intent" in order to convict.

## CONCLUSION

The district court's judgment is affirmed.