**UNITED STATES of America**

**v.**

**Jamie DWYER, et al., Defendants**

**No. CR. 03–30018–MAP.**

United States District Court,
D. Massachusetts.

Oct. 7, 2003.

---

William M. Welch, II, United States Attorney's Office, Springfield, MA, for Plaintiff.

John S. Ferrara, Dalsey, Ferrara & Albano, Springfield, MA, for Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT DWYER'S MOTION FOR DISCOVERY REGARDING THE DEFENSE OF PROSECUTORIAL VINDICTIVENESS (Document No. 38)*

NEIMAN, United States Magistrate Judge.

Together with Gerald Phillips, Giuseppe Polimeni and Luisa Cardaropoli, Jamie Dwyer ("Defendant") was indicted on March 27, 2003. She is charged with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 371 and 1343 (Count I), wire fraud in violation of 18 U.S.C. § 1343 (Counts Two, Three and Four), program fraud in violation of 18 U.S.C. § 666(a)(1)(A) (Counts Five, Six and Seven), and obstruction of justice in violation of 18 U.S.C. § 1503 (Counts Eight and Eleven). Presently before the court is Defendant's motion for discovery relative to a claim of vindictive prosecution. The Government asserts that the motion should be denied because Defendant has failed to establish a *prima facie* case of prosecutorial vindictiveness. A non-evidentiary hearing was held on August 28, 2003.[1] For the reasons which follow, the court will allow Defendant's motion, but only in a limited respect.

## I. BACKGROUND

Defendant was employed for about eighteen years at the Massachusetts Career Development Institute ("MCDI") from which she had graduated. (Document No. 55, Defendant's Offer of Proof in Support of her Motion for Discovery Regarding the

Defense of Prosecutorial Vindictiveness ("Def.'s Offer of Proof"), Exhibit 2 ("Dwyer Aff.") ¶ 3 and Exhibit 3.) MCDI was the focus of a criminal investigation which led to the instant indictment. (See *id.,* Exhibit 3.) Defendant's responsibilities as an administrative assistant at MCDI included handling payroll for employees of its Baking Company. (*Id.,* Dwyer Aff. ¶ 4.) Defendant's employment was suspended on May 1, 2003, as a result of the indictment. (*Id.* ¶ 3.)

Defendant was first interviewed by FBI agents on March 7, 2002, in connection with the investigation. (*Id.* ¶¶ 12, 13.) When Defendant was later subpoenaed to appear before a grand jury, she retained John S. Ferrara ("Ferrara") as counsel. (*Id.* ¶¶ 13, 14.) On March 18, 2002, Ferrara contacted Assistant United States Attorney William M. Welch II ("Welch") who confirmed that Defendant was "merely a witness" before, not "a target" of, the grand jury. (*Id.,* Exhibit 1 ("Ferrara Aff.") ¶ 6.) Ferrara requested that Defendant be given immunity in exchange for her testimony. (*Id.* ¶ 8.) Welch refused; he explained that he "was tired of giving immunity to witnesses who did not deserve it" and that, in any event, Defendant had no good-faith basis for invoking the Fifth Amendment since she claimed to have no knowledge of any wrongdoing. (Document No. 45, Government's Response to Defendant Dwyer's Motion for discovery ("Gov't's Response"), Exhibit 1 ("Welch Aff.") ¶¶ 3, 4. See also "Welch's Substituted Aff.," attached to Document No. 54, ¶¶ 3, 4.) Welch also insisted that Defendant appear personally and told Ferrara that, if Defendant asserted a Fifth Amendment privilege, he would move to compel her

---

1. Although Defendant's counsel indicated on July 29, 2003, that Defendant might seek an evidentiary hearing on her motion, she abandoned that position on the record on August 28, 2003.

testimony. (See Welch Aff. ¶¶ 3, 4; Welch's Substituted Aff. ¶¶ 3,4.)

On March 21, 2002, Defendant appeared at the grand jury proceedings. (Ferrara Aff. ¶ 15.) Ferrara again indicated to Welch that his client intended to assert her Fifth Amendment rights. (Id.) Welch reiterated his reasons for refusing to apply for immunity and then offered Defendant a proffer letter, which was refused. (Id. ¶ 16.)

Defendant proceeded to invoke the Fifth Amendment before the grand jury. (Id. ¶ 18.) Welch then told Defendant that "I'm going to respectfully ask that you remind [your lawyer] that the Fifth Amendment can only be asserted when there's a good faith belief that your answer to my particular question will incriminate you." (Id.) Welch acknowledges that he did not instruct the grand jury at that time not to draw an adverse inference from Defendant's invocation of the privilege. (Document No. 59, Government's Reply to Defendant Dwyer's Offer of Proof, ("Gov't's Reply"), Exhibit 1 ("Welch's Third Aff.") ¶ 7.)

Soon after Defendant's grand jury appearance, Welch filed a motion to compel her testimony. (Def.'s Offer of Proof, Exhibit 7.) The motion asserted that "Ms. Dwyer cannot assert her Fifth Amendment privilege in good faith because there is no evidence that Ms. Dwyer engaged in any wrongdoing." (Id. ¶ 3.) Defendant filed an opposition. (Id., Exhibit 8.) The Government's reply, filed on March 29, 2002, effectively withdrew the motion, the Government having apparently concluded by then that Defendant might well have grounds to invoke her Fifth Amendment privilege against self-incrimination. As the Government explained: "On March 27th, 2002, a witness came forward and identified Ms. Dwyer as having knowledge about criminal activity at MCDI. This witness' information contradicts Ms. Dwyer's statements to FBI agents during an interview on March 12th, 2002." (Id., Exhibit 9.) The Government has since produced the FBI report which, purportedly, provided the basis for withdrawing its motion to compel. (See Gov't's Reply, Exhibit 1(A).) The report indicates that a confidential informant stated to an FBI agent via telephone that Defendant had "direct knowledge" that Gerald Phillips was trading "sex for jobs." (Id.) [2]

Both parties agree that on April 30, 2002, about a week after Defendant's grand jury appearance, a telephone conversation took place between Ferrara and Welch. (See Ferrara, Aff. ¶ 30; Welch's Substituted Aff. ¶ 10.) However, the parties dispute the exact content of the conversation. Ferrara avows that Welch informed him that Defendant was going to be indicted. (Ferrara Aff. ¶ 30.) In support, Ferrara offers his contemporaneous memorandum of conversation which indicates that Welch told him that "she's going to be indicted. Have a couple of people who say she was knowledgeable about false time sheets. She could have cleared it up. How? By making a proffer." (Def.'s Offer of Proof, Exhibit 10.) For his part, Welch avows that he did not make these particular statements but merely said, in response to Defendant's refusal to make a proffer, that "if she gets indicted, well then she gets indicted." (Welch's Substituted Aff. ¶ 10.) In any event, there

2. In his substituted affidavit, Welch more specifically explains that "[o]n March 27, 2002, the Government received information from a FBI confidential source that Ms. Dwyer in fact knew that MCDI had no-show employees on the payroll," so he withdrew the motion to compel since the Government "now possessed information that Ms. Dwyer had been a knowing participant in fraud." (Welch's Substituted Aff. ¶ 9.)

is no dispute that, during the telephone conversation, Ferrara offered to arrange to have Defendant appear for an arraignment. Ferrara does not recall how Welch responded, although he concedes it was "likely silence." (Ferrara Aff. ¶ 32.) For his part, Welch claims that he "did not respond to the offer." (Welch's Substituted Aff. ¶ 10.)

In May or June of 2002, Keith Lockett ("Lockett"), apparently another witness before the grand jury, contacted Defendant about her invocation of the Fifth Amendment. (Ferrara Aff. ¶ 35; Welch Aff. ¶ 13.) The impetus for and details of this contact are highly contested. Ferrara, supported by the affidavits of Defendant and David Tetrault, a private investigator, asserts that Welch approached Lockett and told him to contact Defendant and encourage her to ignore the advice of her attorney and cooperate with the FBI or that she would go to jail. (Ferrara Aff. ¶¶ 35–39; Def.'s Offer of Proof, Dwyer Aff. ¶¶ 24–29, and Exhibit 12.) Welch initially denied this description of events. (Welch Aff. ¶¶ 12, 13.) Subsequently, however, Welch conceded that he "consented" to Lockett's own request to tell Defendant that the Government was not interested in charging her and merely wanted to talk to her under the terms of a proffer. (Welch's Third Aff. ¶ 10.) Welch's description is supported by Lockett's affidavit. (Gov't's Reply, Exhibit 4.)

Defendant was indicted on March 27, 2003. Without prior notification to Ferrara, Defendant was arrested, and handcuffed, at her home on March 31, 2003. (Ferrara Aff. ¶ 44; see also Def.'s Offer of Proof, Exhibit 13.)

On May 21, 2003, Defendant filed the instant motion for discovery, part of which concerns her intended vindictive prosecution defense. On September 4, 2003, this court ruled on Paragraphs 1, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20 of the motion. Today, the court addresses the discovery requests remaining in Paragraphs 2, 3, 4, 5, 6 and 8 as they relate to the defense of vindictive prosecution: grand jury transcripts; reports of investigating agents or officers; reports of the United States Attorney's Office or any investigating agents or officers regarding efforts to influence Defendant to cooperate; memoranda, notes, letters or documents regarding the Government's decision to seek an indictment against Defendant and/or to arrest her; and information regarding informants and cooperating witnesses.[3]

## II. *Discussion*

The court will first examine the standards for a vindictive prosecution defense and for obtaining discovery with respect thereto. The court will then apply the discovery standard to the facts of this case and evaluate Defendant's requests. In the end, the court concludes that Defendant is entitled to some discovery, albeit significantly limited in both subject and time.

### A. *Legal Standards*

 In general, a prosecutor's decision to indict is "presumed legitimate." *United States v. Sanders*, 211 F.3d 711, 716 (2nd Cir.2000). As the Supreme Court has noted, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged

---

**3.** Defendant entitles paragraph two of her motion "Statements Relevant to the Defenses of Vindictive Prosecution and Impairment of the Integrity of the Grand Jury." However, she provides no argument for discovery regarding a claim of "impairment of the grand jury." The court, therefore, declines to address this particular claim in the present context.

their official duties." *United States. v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (internal quotation marks omitted). *See also United States v. Serafino,* 281 F.3d 327, 331 (1st Cir.2002) ("[T]he government is presumed to have exercised its prosecutorial responsibilities in good faith . . . ."). Prosecutorial discretion, however, "is 'subject to constitutional restraints.'" *Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480 (quoting *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979)). In particular, the Due Process Clause of the Fifth Amendment restrains a prosecutor from punishing a defendant "for exercising a protected statutory or constitutional right." *United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). Such vindictive prosecution can result in the dismissal of an indictment. *See United States v. Lanoue,* 137 F.3d 656, 664 (1st Cir.1998).

■ Vindictive prosecution can be shown by (1) producing evidence of actual vindictiveness or (2) establishing a sufficient likelihood of vindictiveness to warrant a presumption of prosecutorial vindictiveness. *See United States v. Marrapese,* 826 F.2d 145, 147 (1st Cir.1987); *Lanoue,* 137 F.3d at 664. With regard to the second alternative, the government can overcome the presumption by offering "objective evidence justifying the prosecutor's action." *Goodwin,* 457 U.S. at 376 n. 8, 102 S.Ct. 2485.

The Supreme Court has not addressed the legal standard for obtaining discovery in relation to a vindictive prosecution claim. It has addressed the issue with regard to selective prosecution claims, however, and when doing so recognized the degree of consensus among the appellate courts that discovery is appropriate only if a defendant produces "some evidence tending to show the existence of the essential elements of the defense." *Armstrong,* 517 U.S. at 468, 116 S.Ct. 1480. The Second and Fourth Circuits have adopted this standard for vindictive prosecution claims. *See United States v. Sanders,* 211 F.3d 711, 717 (2d Cir.2000) ("We see no reason to apply a different standard to obtain discovery on a claim of vindictive prosecution."); *United States v. Wilson,* 262 F.3d 305, 315 (4th Cir.2001) (similar). For its part, the Seventh Circuit, prior to *Armstrong,* had also applied essentially the same discovery standard to both selective and vindictive prosecution defenses. *See United States v. Heidecke,* 900 F.2d 1155, 1159 (7th Cir.1990) (to obtain discovery, defendant must show a "colorable basis" for the claim of prosecutorial vindictiveness). *See also Armstrong,* 517 U.S. at 468, 116 S.Ct. 1480 (viewing "colorable basis" language as typical of the lower courts' "consensus about the evidence necessary to meet" the standard). The Sixth Circuit, too, prior to *Armstrong,* drew no distinction for discovery purposes between vindictive and selective prosecution claims. *See United States v. Adams,* 870 F.2d 1140, 1146 (6th Cir.1989). As the Supreme Court would later echo, the Sixth Circuit determined that a defendant would be entitled to discovery if he introduced "some evidence tending to show the existence of the essential elements of the defense." *Id.* (citations and internal quotation marks omitted).

The First Circuit has not weighed in on the issue. It has only recognized, post-*Armstrong,* that "generally where a defendant can point to specific facts that raise a likelihood of vindictiveness a district court must grant an evidentiary hearing on the issue." *Lanoue,* 137 F.3d at 665. In coming to this conclusion, however, the First Circuit cited *Adams* with approval. *Id.*

In this court's view, there are limits in applying *Armstrong's selective* prosecution

discovery standard to discovery requests regarding claims of *vindictive* prosecution. The Supreme Court in *Armstrong* essentially grafted onto the discovery standard then used by the various appellate courts a requirement in selective prosecution claims that a defendant make "a credible showing of different treatment of similarly situated persons." *Id.*, 517 U.S. at 470, 116 S.Ct. 1480. *See also Serafino*, 281 F.3d at 331. Such a showing is obviously not applicable to claims of vindictive prosecution where selectivity is not an element. Nonetheless, *Armstrong* requires more generally that, "before a court allows a defendant to have discovery on the government's prosecutorial decisions, the defendant must overcome a significant barrier by advancing objective evidence tending to show the existence of prosecutorial misconduct." *Wilson*, 262 F.3d at 315 (citing *Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480). It is this more general standard that the court will apply here.

## B. *Application of the Standard*

■ As the Government asserts, it is somewhat difficult to decipher whether Defendant, in seeking discovery, claims actual vindictiveness or merely a sufficient likelihood of vindictiveness as to trigger a presumption. Of course, Defendant need not yet prove either actual vindictiveness or the likelihood of vindictiveness. The Government's approach to the contrary (see Gov't's Response at 14), the court need only address whether discovery on the claim is warranted. Accordingly, Defendant need only advance some objective evidence tending to show prosecutorial vindictiveness for discovery to be allowed.

Before applying the standard, the court makes a preliminary observation. As the Government argues, it may be unusual for a court to find a presumption of prosecutorial vindictiveness prior to trial. *See*

*Sanders*, 211 F.3d at 719. In fact, the First Circuit has cautioned that "courts should go very slowly in embracing presumptions of prosecutorial vindictiveness in pretrial settings." *United States v. Stokes*, 124 F.3d 39, 45 (1st Cir.1997). *See also Wilson*, 262 F.3d at 315 ("Because the presumption of vindictiveness must be applicable to all cases presenting the same circumstances, it will rarely, if ever, be applied to prosecutors' pretrial decisions."); *United States v. Koh*, 199 F.3d 632, 639 (2d Cir.1999) ("[T]he presumption of prosecutorial vindictiveness generally does not arise in the pretrial setting."). Nonetheless, court orders requiring pretrial discovery on the issue are by no stretch of the imagination unprecedented. *See* Note, *Breathing New Life into Prosecutorial Vindictiveness Doctrine*, 114 Harv. L.Rev. 2074, 2095 (2001) (arguing for a stronger vindictiveness doctrine and calling for courts to refrain from drawing a categorical distinction between a defendant's pretrial and postrial exercise of rights).

The Sixth Circuit's decision in *Adams* is a case in point. There, the defendant claimed that she was indicted in retaliation for bringing a discrimination suit against the Equal Employment Opportunity Commission ("EEOC"). *Id.*, 870 F.2d at 1141. Among the evidence she presented in seeking discovery was an affidavit referencing "various confidential [investigation] memoranda" from the EEOC attorney who was targeted in the defendant's discrimination suit. *Id.* at 1144. The affidavit described the attorney's "reputation for being unfair and vindictive towards people who cross him" and alleged that the "EEOC had instigated and pushed the investigation and prosecution of [the defendant] in revenge." *Id.* at 1144 (internal quotation marks omitted). Another affidavit affirmed that an indictment would not "ordinarily" follow such actions as the defendant was alleged to have engaged in.

*Id.* at 1146. Given such evidence, the Sixth Circuit determined that "this is one of those rare cases where the defendant[ ][is] entitled to discovery on the issue of whether the government's decision to prosecute was tainted by improper motivation." *Id.* at 1141. "It may well be that no fire will be discovered under all the smoke," the court concluded, "but there is enough smoke here" to warrant limited discovery. *Id.* at 1146.

With that prelude, the court turns to the matter at hand. Here, Defendant's request for discovery is based on the following objective evidence supplied by Defendant and not contradicted by the Government: (1) Welch's agitated response when Ferrara initially asked for a grant of immunity, i.e., that he "was tired of giving immunity to witnesses who did not deserve it"; (2) Welch's insistence that Defendant appear personally before the grand jury; (3) Welch's offer of a proffer letter at the grand jury proceedings; (4) Welch's failure to instruct the grand jury at the time of Defendant's testimony with regard to claims of privilege based on the Fifth Amendment; (5) the Government's withdrawal of its motion to compel based on the evidence provided by a confidential informant; (6) the fact that Defendant went from being a witness to a target within one week of invoking the Fifth Amendment; and (7) the fact that Defendant was arrested rather than summoned to appear for her arraignment. Defendant's request is also based on Ferrara's affidavit that Welch stated on April 30, 2002, that Defendant was going to be indicted and that Welch was allegedly involved in interfering, through Keith Lockett, with Defendant's right to counsel. As can be seen, some of Defendant's allegations are highly personal.

██ In the court's opinion, the evidence proffered by Defendant does not point to actual vindictiveness on the part of the Government. It is generally agreed that a "finding of actual vindictiveness requires 'direct' evidence, such as evidence of a statement by the prosecutor, which is available 'only in rare cases.'" *United States v. Johnson,* 171 F.3d 139, 140 (2nd Cir.1999). To establish actual vindictiveness, "a defendant must prove objectively that the prosecutor's charging decision was a 'direct and unjustifiable penalty' ... that resulted 'solely from the defendant's exercise of a protected legal right.'" *Sanders,* 211 F.3d at 716–17. To do this, "the Defendant must show '(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse', and (2) [the defendant] would not have been prosecuted except for that animus.'" *Id.* at 717. Defendant's evidence here, in the court's opinion, falls short of these requirements even for discovery purposes.

██ The evidence, however, tips slightly the other way with regard to the likelihood of vindictiveness, at least for purposes of Defendant's discovery motion. To be sure, as described, a presumption of vindictiveness generally does not arise in a pretrial setting. Here, however, Defendant presents not only a unique set of circumstances, but something more than a mere chronology, i.e., an invocation of the Fifth Amendment followed by an indictment, most particularly Ferrara's description of Welch's statement on April 30, 2002, that Defendant would in fact be indicted. Assuming for purposes here that Ferrara's description is accurate, the Government's decision to indict Defendant at that time would have been based on scant evidence, a telephonic statement by a confidential informant that Defendant had "direct knowledge" of Gerald Phillips' alleged "sex

for jobs" scheme. This statement, standing alone, may well have been sufficient to cause the Government to withdraw its motion to compel, as it did, but not enough evidence to indict.

Of course, the conflict between Ferrara's version of the April 30th conversation and Welch's will be scrutinized should the trial court choose to hold an evidentiary hearing on Defendant's intended motion to dismiss. For purposes here, however, both parties have been content to proceed without an evidentiary hearing on Defendant's present motion for discovery. Thus, this court need not, and cannot, make credibility judgments regarding the competing affidavits of Ferrara and Welch—both of whom, by the way, the court personally holds in high regard. Of course, should Welch's version of the conversation hold sway, Defendant's motion to dismiss may well be doomed. *Cf. Goodwin*, 457 U.S. at 377, 102 S.Ct. 2485 ("[T]he Due Process Clause of the Fourteenth Amendment [does] not prohibit a prosecutor from carrying out a threat, made during plea negotiations, to bring additional charges against an accused who refused to plead guilty to the offense with which he was originally charged."); *Bordenkircher v. Hayes*, 434 U.S. 357, 365, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (finding no vindictive motive when prosecutor followed through a pretrial threat to increase charge if defendant did not plead guilty). For the moment, however, the court believes that the evidence proffered with respect to events following Defendant's invocation of the Fifth Amendment before the grand jury and leading up to the April 30th conversation is sufficient to merit at least some discovery.

In reaching this conclusion, the court has not determined whether Defendant had the right to invoke the Fifth Amendment at the time she did. *See Grune-*

*wald v. United States*, 353 U.S. 391, 421, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (holding that one of the Fifth Amendment's "basic functions ... is to protect *innocent* men ... who otherwise might be ensnared by ambiguous circumstances") (citation and internal quotation marks omitted) (emphasis in original). *See generally Ohio v. Reiner*, 532 U.S. 17, 121 S.Ct. 1252, 149 L.Ed.2d 158 (2001) (witness could assert Fifth Amendment privilege despite claim of innocence because she had reasonable cause to apprehend danger from her answers); Angela Roxas, *Questions Unanswered: The Fifth Amendment and Innocent Witnesses*, 93 J.Crim. L. & Criminology 259 (2002) (discussing *Reiner*). Indeed, for the moment, the parties appear to have agreed to disagree on this point. Again, the only question before the court is whether Defendant is entitled to discovery.

As the Government points out, the defendant in *Adams*, who obtained pretrial discovery, may well have presented more compelling, objective evidence of vindictive prosecution than is presently before this court. *Id.*, 870 F.2d 1140. That alone, however, does not bar Defendant from obtaining discovery here. As described, Defendant need only provide some objective evidence tending to show a likelihood of vindictiveness. *See also United States v. Tuitt*, 68 F.Supp.2d 4, 18 (D.Mass.1999) (holding that the evidence "raise[s] an eyebrow high enough as to require further explanation in the form of some of the discovery Defendant seeks"). In the court's opinion, that showing has been made here at least for the period of time between Defendant's appearance before the grand jury and Ferrara and Welch's telephone conversation of April 30, 2002. Indeed, the evidence Defendant has provided for that time period is more compelling than that presented in *Sanders* where discovery was denied. *Id.*, 211 F.3d 711.

It should be evident that, in reaching this conclusion, the court has not credited Defendant's other arguments in support of discovery. In particular, the court believes that the Government was within its rights to refuse to seek immunity. The court also believes that the grand jury was well enough aware of Defendant's Fifth Amendment rights—although not explained by Welch at the time of her testimony—to preclude further discovery on that particular claim. (*See* Document No. 58: Government's Request to File Grand Jury Foreperson Affidavit, Exhibit 2.) Similarly, the court does not believe that the decision to have Defendant arrested rather than summoned to appear for arraignment, even if that were a deliberate decision, is sufficient grounds for further discovery. Most importantly, the court has determined that Welch's conversation with Lockett, although troubling, provides insufficient grounds to order discovery.[4]

Granted, Defendant argues that the court should consider these events together. That may well occur should Defendant file a motion to dismiss. But the court's sole task at this juncture is to determine what, if any, additional discovery Defendant might receive from the Government. And it is the court's opinion, for the reasons stated, that the only discovery to be had surrounds the time period between Defendant's invocation of the Fifth Amendment before the grand jury on March 21, 2002, and Welch and Ferrara's telephone conversation on April 30, 2002. Defendant already has sufficient information with respect to the other events to add to the mix should she seek to dismiss the indictment.

### III. CONCLUSION

For the reasons described, Defendant's Motion for Discovery is ALLOWED as follows:

1. Regarding Paragraph 3, the Government shall provide Defendant with grand jury transcripts from March 21, 2002, through April 30, 2002, hereinafter the "time frame," which relate directly or indirectly to Defendant herself and/or the witness who came forward on March 27, 2002.

2. Regarding Paragraph 4, the Government shall provide Defendant with any reports of investigating agents or officers during the time-frame, excluding internal memoranda of the United States Attorney's Office, which relate to Defendant herself and/or the witness who came forward on March 27, 2002.

3. Regarding Paragraph 8, the Government shall provide Defendant with all written or documentary information received by the United States Attorney's Office or investigating agents or officers during the time-frame, excluding internal memoranda of the United States Attorney's Office, regarding informants and cooperating witnesses which relate to Defendant herself and/or the witness

---

**4.** At worst, as the Government acknowledges, Defendant's allegations with regard to Lockett may raise questions of ethics. *See*, e.g., Rule 4.2 of the Massachusetts Rules of Professional Conduct (prohibiting communication by attorneys with persons represented by counsel); 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, govern-ing attorneys in each State where such attorney engage in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."). But, having considered the affidavits provided, the court believes that Welch's actions with regard to Lockett do not have the flavor of vindictiveness as to necessitate further discovery with respect to Defendant's present motion.

who came forward on March 27, 2002.

The Government must produce the discovery within two weeks of the date hereof. In all other respects and except as previously ordered, Defendant's motion is DENIED.

IT IS SO ORDERED.