United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 13, 2006**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 13, 2006

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-30859
_____

UNITED STATES OF AMERICA

        Plaintiff - Appellee

   v.

HARRY H ADAIR

        Defendant - Appellant

---

Appeal from the United States District Court
for the Eastern District of Louisiana, New Orleans

---

Before KING, Chief Judge, and BARKSDALE and CLEMENT, Circuit
Judges.

KING, Chief Judge:

Upon reconsideration, this panel's previous opinion in this
case, United States v. Adair, 2005 WL 2990586 (5th Cir. Nov. 8,
2005), is hereby withdrawn in its entirety and replaced by the
following.

Defendant-Appellant Harry Adair was convicted of conspiring
to commit money laundering in violation of 18 U.S.C. § 1956(a)
(1)(B)(i) & (h).  Pursuant to the then-mandatory sentencing
guidelines, the district court sentenced him to 240-months

- 1 -

imprisonment. The court also imposed an alternative sentence of fifty-one months in the event that the guidelines were later struck down in their entirety as unconstitutional or if the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), were held applicable to the guidelines. Adair now appeals his conviction and sentence. We AFFIRM his conviction and VACATE and REMAND for resentencing.

## I.  BACKGROUND

### A.  Factual Background

In late 2002 or early 2003, the United States Customs Service received word from an informant that Adair was attempting to broker a transaction involving Venezuelan bonds that were suspected of being counterfeit. United States Secret Service Special Agent Shane Davis contacted Adair, posing as the nephew of a drug dealer who was looking to launder drug profits. Adair told Agent Davis that he wanted to broker the sale of $155 million in Venezuelan bonds. Agent Davis expressed interest in the bonds, explicitly telling Adair that he was interested in purchasing the bonds in an effort to launder drug proceeds. Adair subsequently arranged a meeting between Agent Davis and the sellers of the bonds, Ken Vicknair and Dave Wallace. The meeting was scheduled for January 15, 2003.

On January 14, 2003, Adair met with Sabrina Gonzales, a Special Agent with the United States Drug Enforcement

Administration ("DEA"), to discuss the possibility of becoming a DEA informant. Adair told Agent Gonzales about the bond transaction that was scheduled to be consummated the next day. Adair, however, neglected to tell Agent Gonzales that the deal was being arranged to launder drug profits. He told her that the bond deal was completely legitimate. Adair proposed to Agent Gonzales that he would discuss the possibility of a cocaine deal with Agent Davis after the bond meeting. He asked her to come along and pose as his financial advisor.

The next morning, Adair again met with Agent Gonzales. She told him that he was not approved to work as an informant because of his past unsatisfactory work as an informant for the DEA. She also told him that he was free to meet with her supervisor at some point after the meeting to discuss why he could not be employed as an informant. Later that day, Adair went to the hotel where the bond meeting was scheduled to take place. Before the meeting, Adair met with Agent Davis and Secret Service Special Agent Patrick Roche, who was also working undercover. The three briefly discussed a potential drug deal, but Agent Davis told Adair that they could discuss the matter further after the bond meeting. Adair, Agent Davis, and Agent Roche then went into the conference room where the meeting was scheduled to take place. They joined Vicknair and Wallace, as well as a third man who was identified as a security guard, who were already in the room. Contrary to what Adair had promised, Vicknair and Wallace

had brought only one $5 million note, rather than the entire $155 million. Agent Davis attempted to delay the transaction until Vicknair and Wallace produced all of the notes. However, Vicknair and Wallace insisted on doing the transaction that day. Agent Davis agreed to the deal, and Adair, Vicknair, and Wallace were thereafter arrested.

## B. Procedural Background

On January 23, 2003, Adair, Vicknair, and Wallace were each charged in a one-count indictment with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) & (h). After Adair's trial was severed from that of his co-defendants, his case was tried before a jury on March 1 and 2, 2004. Pursuant to FED. R. EVID. 404(b), the government submitted evidence, over Adair's objection, of Adair's previous involvement with a similar scheme to launder drug money. This evidence consisted of testimony by United States Customs Service Special Agent Mike Tyson. Agent Tyson's testimony was offered to discredit Adair's defense that he did not intend to launder money but instead intended to set up a prosecution for the DEA. Agent Tyson testified that in 2000, posing undercover, he assisted Adair in a scheme in which Adair sought to convert $4.2 million in Italian currency into $4 million in cashier's checks. Adair then sought to purchase $4 million worth of gemstones with the cashier's checks. Adair would then have sold the gemstones to

drug dealers for $10 million in cash.  This series of transactions was never completed, and the Customs Service closed its undercover operation.

On March 2, 2004, the case went to the jury, and it returned a guilty verdict.  Adair was sentenced on August 18, 2004. Applying the then-mandatory United States Sentencing Guidelines, the court sentenced Adair to 240-months imprisonment.  The court also levied an alternative sentence, stating: "should the sentencing guidelines later be found to be unconstitutional in their entirety, or, should the Blakely case apply to the federal sentencing guidelines, it will be the judgment and order of this Court that you be committed . . . for a term of fifty-one months."

Adair timely filed the instant appeal, arguing that: (1) the government failed to provide sufficient evidence to meet the statutory requirements of the offense with which he was charged; (2) the district court erred in admitting Agent Tyson's testimony under Rule 404(b); and (3) his sentence should be vacated and remanded to the district court for imposition of the alternative fifty-one month sentence.

## II.  DISCUSSION

### A.  The Government Provided Sufficient Evidence to Prove the Charged Offense

Adair was convicted under § 1956(h) of conspiring to violate § 1956(a)(1)(B)(i).  Subsection (h) of § 1956 states: "Any person

who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." In the instant case, the offense defined elsewhere in § 1956 was subsection (a)(1)(B)(i). This subsection states:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which <u>in fact</u> involves the proceeds of specified unlawful activity--
> . . .
> (B) knowing that the transaction is designed in whole or in part--
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
> . . .
> shall be sentenced to a fine of not more than $500,000 . . . or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i) (2000) (emphasis added). To be guilty under this provision, a defendant need not have specifically intended to conceal or disguise the proceeds of the unlawful activity. It is sufficient for the defendant merely to be aware of the perpetrator's intent to conceal or disguise the nature or source of the funds.

Adair argues that the government failed to provide sufficient evidence of his guilt under § 1956(h) because it neglected to prove a critical element of § 1956(a)(1)(B)(i). Drawing on the words "in fact," Adair asserts that criminal liability under § 1956(a)(1)(B)(i) requires that the government

prove that the laundered funds were <u>actually</u> proceeds from unlawful activity.  In this case, Adair claims, the funds to be laundered, if they existed at all, were government funds and clearly were not drug proceeds.  Adair thus argues that the government's failure to prove this element of the underlying money-laundering offense precludes a finding of liability for conspiracy to launder money.

Adair asserts that Congress intended sting operations to be prosecuted through § 1956(a)(3), the so-called "government sting provision."  This provision states:

> (3) Whoever, with the intent [to conceal the true nature or ownership of property believed to be the proceeds of unlawful activity] conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined [or imprisoned]. . . . [T]he term "represented" means any representation made by a law enforcement officer . . . .

Citing 134 CONG. REC. S17360-02 (1988),[1] Adair claims that § 1956(a)(3) was added specifically to allow prosecutions in undercover sting operations involving money laundering because the laundering of government-supplied funds is not an offense under § 1956(a)(1).  Citing the same section of the Congressional Record, Adair argues that § 1956(a)(3) included a stricter mens rea requirement than is required for § 1956(a)(1).  Adair claims

---

[1]  Adair cited 134 CONG. REC. S27420 in support of these claims.  However, it appears that the passage to which he refers is properly cited as 134 CONG. REC. S17360-02 (1988).

- 7 -

that in the instant case, the government made no attempt to meet this heightened mens rea requirement, nor did the jury instructions call for such a heightened mens rea. Adair argues that allowing the government to prosecute a participant in a sting operation through a conspiracy charge would allow it to make an end-run around § 1956(a)(3)'s heightened mens rea requirement. Because the funds involved in the sting were not actually proceeds of illegal activity and because the government made no attempt to meet § 1956(a)(3)'s heightened mens rea requirement, Adair concludes that the government failed to prove its case against him.

In reviewing challenges to the sufficiency of evidence, we must consider "all the evidence in the light most favorable to the verdict, [and determine whether] a rational trier of fact could have found that the evidence established the elements of the offense beyond a reasonable doubt." United States v. Villanueva, 408 F.3d 193, 201 (5th Cir. 2005). It is clear that a rational trier of fact could have found beyond a reasonable doubt that Adair was guilty of the charged offense.

In United States v. Threadgill, 172 F.3d 357 (5th Cir. 1999), we previously considered the argument that prosecution under § 1956(h) requires proof of the elements of the substantive offense under § 1956(a)(1). We stated:

> The critical error in the defendants' position is its
> presumption that a conspiracy charge must also describe
> the legal elements that comprise the substantive crime

- 8 -

that is the object of the conspiracy. It is settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy. Thus, we have consistently held that a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit.

Id. at 367 (internal citations omitted). Further, allowing the government to charge Adair with conspiracy under § 1956(a)(1) does not frustrate congressional intent. When Congress added § 1956(h), the conspiracy subsection, in 1992, both § 1956(a)(1) and § 1956(a)(3) were already in place.[2] The broad language in § 1956(h) does not preclude the government from charging Adair with conspiracy under § 1956(a)(1), even in a government sting operation. Had Congress wished to prevent conspiracy charges under § 1956(a)(1) for government sting operations, it could have drafted § 1956(h) to preclude such a result.

In light of the broad language in § 1956(h) and the fact that it was enacted after both § 1956(a)(1) and § 1956(a)(3), we find Threadgill persuasive and controlling in this case. We thus hold that a criminal defendant may be prosecuted for conspiracy to commit money laundering under § 1956(h) in a government sting case without proving that the funds provided by the government

---

[2] See Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1352, 100 Stat. 3207 (1986) (codified at 18 U.S.C. § 1956(a)(1) (2000)); Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 6465, 102 Stat. 4181 (codified at 18 U.S.C. § 1956(a)(3) (2000)); Housing and Community Development Act of 1992, Pub. L. No. 102-550, § 1530, 106 Stat. 3672 (codified at 18 U.S.C. § 1956(h) (2000)).

agent were actually the proceeds of unlawful activity.  See

Threadgill, 172 F.3d at 367.

**B.    The District Court Did Not Err in Admitting the Rule 404(b) Evidence**

We review a trial court's admission of evidence pursuant to Rule 404(b) under a "heightened abuse of discretion standard." United States v. Alarcon, 261 F.3d 416, 424 (5th Cir. 2001).  For extrinsic evidence to be admitted under Rule 404(b), it must meet two criteria.  The evidence must: (1) be relevant under Rule 401 to some issue besides the defendant's character; and (2) possess probative value that substantially outweighs its prejudicial impact under Rule 403.  United States v. Infante, 404 F.3d 376, 388 (5th Cir. 2005).

Adair argues that Agent Tyson's testimony was inadmissible because it fails under the second prong of the test for 404(b) evidence, i.e., its probative value fails to substantially outweigh its prejudicial impact.  Adair contends that the evidence was not particularly probative because Agent Gonzales's later testimony directly discredited Adair's claim that he was merely trying to set Agent Davis up for a drug prosecution, whereas the 404(b) evidence merely discredited the defense by inference.  At the same time, Adair claims, Agent Tyson's testimony was highly prejudicial because the prior scheme's similar factual circumstances increased the likelihood that the jury would make impermissible character propensity inferences.

To determine whether the probative value of Agent Tyson's testimony substantially outweighs any possible unfair prejudice, we must make a common-sense assessment of the relevant circumstances surrounding the extrinsic evidence.  See United States v. Beechum, 582 F.2d 898, 914 (5th Cir. 1978).  Some of the factors we must consider include: (1) "the extent to which the defendant's unlawful intent is established by other evidence"; (2) the "overall similarity of the extrinsic and charged offenses"; and (3) "how much time separates the extrinsic and charged offenses [because] temporal remoteness depreciates the probity of the extrinsic offense."  Id. at 915.

In this instance, the evidence of Adair's prior money-laundering scheme was highly probative.  First, Agent Tyson's testimony was not merely cumulative of Agent Gonzales's testimony.  Given that Adair argued at trial that Agent Gonzales's testimony established reasonable doubt as to his intent, the government cannot now be penalized for having offered additional evidence as to Adair's intent.  This is particularly so considering that Adair's intent was the only meaningful issue litigated in the district court.  Second, the prior scheme was similar to the transaction at issue in the instant appeal, as both transactions involved laundering drug money through the use of foreign currency.  Third, Adair's prior money-laundering scheme was temporally significant, as it occurred less than three years before the conduct at issue in the instant appeal.  We thus

- 11 -

conclude that Agent Tyson's testimony was highly probative.  We also conclude that Agent Tyson's testimony had little opportunity of creating unfair prejudice because: (1) Tyson's testimony did not occupy a significant portion of the trial; (2) the prior scheme was not a more serious offense than the offense with which Adair was charged in the instant case; and (3) the district court mitigated any prejudicial effect by giving the jury a limiting instruction.  Accordingly, we conclude that the district court did not err in allowing Agent Tyson to testify pursuant to Rule 404(b).

**C.    Adair's Sentence Must Be Vacated and Remanded**

Adair argues that pursuant to United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), both scenarios triggering the court's lower alternative sentence have come to pass.  He claims that in Booker, the Supreme Court both (1) declared the sentencing guidelines unconstitutional in their entirety, and (2) applied Blakely to the sentencing guidelines.  Accordingly, he argues that we should vacate his sentence and remand for imposition of the alternative fifty-one month sentence.  The government concedes that it was error for the district court to sentence Adair pursuant to the mandatory sentencing guidelines.  The government also does not contend that the error was harmless.  The government thus agrees with Adair that his sentence should be vacated and that the case should be remanded to the district

court.  The government, however, does not explicitly state whether the alternative sentence should be imposed.

As an initial matter, it is clear that the district court committed Booker error because it enhanced Adair's sentence based on factors that Adair never admitted to and that were not found by a jury beyond a reasonable doubt.  Booker, 125 S. Ct. at 756 ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.").  It is also clear that Adair preserved his objection to this error.  In response to the presentence report, Adair argued that his recommended sentence violated his Sixth Amendment rights because the sentence was computed pursuant to factors that were not found by the jury.  The question now before us is whether we should (1) remand to the district court for resentencing, or (2) impose the alternate sentence.

In United States v. Walters, 418 F.3d 461 (5th Cir. 2005), we previously considered the applicability of an alternate lower sentence predicated on the outcome of Booker.  In Walters, the district court imposed a seventy-five month sentence pursuant to the sentencing guidelines.  The district court also stated that if the sentencing guidelines were declared unconstitutional in their entirety, it would impose an alternate sentence of sixty months.  Id. at 463.  In Walters, rather than simply imposing the

lower alternative sentence, we vacated the defendant's sentence and remanded to the district court for resentencing in accordance with Booker. Id. at 466. We noted that the condition for the alternative sentence in that case, i.e., the sentencing guidelines being declared unconstitutional in their entirety, did not occur. Id. at 465-66. Rather than striking down the sentencing guidelines in toto, Booker declared the guidelines merely advisory. See United States v. Villegas, 404 F.3d 355, 359 (5th Cir. 2005). We thus find that the first trigger for imposing Adair's alternative sentence--that the Supreme Court in Booker declared the sentencing guidelines unconstitutional in their entirety--is not met.

We must next consider whether the second trigger for imposing Adair's alternate sentence of fifty-one months is met, i.e., whether the Supreme Court applied Blakely to the sentencing guidelines. Although this court previously has remanded for resentencing cases in which the district court imposed a lower alternative sentence in the event that the sentencing guidelines were declared unconstitutional, we have not yet considered a case in which the district court predicated its lower alternative sentence on Blakely's applicability to the sentencing guidelines. See, e.g., United States v. Henefield, 143 F. App'x 586, 587 (5th Cir. Aug. 5, 2005) (remanding for resentencing where the district court imposed a "discretionary sentence to take effect if the Sentencing Guidelines were invalidated"); Walters, 418 F.3d at

- 14 -

465-66 (remanding for resentencing where the district court imposed a lower alternative sentence if the guidelines were declared entirely unconstitutional); United States v. Bell, 148 F. App'x 194, 195 (5th Cir. June 10, 2005) (remanding for resentencing where the district court imposed alternative sentences depending on whether the guidelines were held unconstitutional in whole or in part).  Thus, because this is an issue of first impression, we must decide what the district court meant when it said it would impose an alternate lower sentence "should the Blakely case apply to the federal sentencing guidelines."

The district court's reference to the Supreme Court's potential application of Blakely to the sentencing guidelines is somewhat unclear in light of what actually happened in Booker. In Blakely, the Supreme Court invalidated the state of Washington's sentencing guidelines because they violated the defendant's Sixth Amendment rights.  Blakely, 124 S. Ct. at 2538. So in one sense, the Supreme Court in Booker did not apply Blakely because in Booker, the sentencing guidelines were not invalidated in their entirety.  See Booker, 125 S. Ct. at 764 (severing and excising the two provisions that made the sentencing guidelines mandatory but leaving the rest of the guidelines intact).  On the other hand, the district court might have meant for the alternate sentence to apply in the event that the Supreme Court were to apply Blakely's rationale and

- 15 -

interpretation of the Sixth Amendment to the sentencing guidelines.  The basic rationale of <u>Blakely</u> is that it violates a defendant's Sixth Amendment right to a trial by jury for a judge to enhance a sentence based on facts neither admitted by the defendant nor proved to a jury beyond a reasonable doubt.  In this sense, the Supreme Court most certainly did apply <u>Blakely</u> to the sentencing guidelines.  <u>Booker</u>, 125 S. Ct. at 755 (holding that "<u>Blakely</u> applies to the Sentencing Guidelines").

Because of the district court's broad language--imposing a lower alternative sentence "should the <u>Blakely</u> case apply to the federal sentencing guidelines"--there is no way for us to discern precisely what the district court meant when it conditioned Adair's alternate sentence on the Supreme Court's application of <u>Blakely</u> to the sentencing guidelines.  Additionally, there is nothing in the record to suggest that the district court anticipated <u>Booker</u>'s remedial holding and considered the sentencing guidelines as one factor among others listed in 18 U.S.C. § 3553(a) in determining Adair's sentence.  <u>See</u> <u>Bell</u>, 148 F. App'x at 195 (noting, in response to the defendant's argument that the court should impose one of the two alternative sentences set forth in the district court's judgment, that "'[e]ven in the discretionary sentencing system established by <u>Booker</u>/<u>Fanfan</u>, a sentencing court must still carefully consider the detailed statutory scheme created by the [Sentencing Reform Act] and the Guidelines'" and remanding for resentencing so that the district

court could consider <u>Booker</u> when imposing the alternative sentences) (quoting <u>United States v. Mares</u>, 402 F.3d 511, 518-19 (5th Cir. 2005)); <u>see also</u> <u>United States v. Porter</u>, 417 F.3d 914, 917-18 (8th Cir. 2005) ("[T]he district court's explanation of its alternative sentence--'as if <u>Blakely</u> would apply'--is too cryptic to conclude that the court's alternative sentence was imposed consistent with <u>Booker</u>.  We cannot say that the court contemplated an advisory guidelines system under which it was required to consider the advisory guideline range as one factor among others listed in 18 U.S.C. § 3553(a). . . .  We therefore conclude that the alternative sentence as formulated in this case is not a sufficient basis to uphold the term of imprisonment . . . .") (internal citations omitted).  We thus find that neither trigger for imposing Adair's lower alternative sentence is met.

At the same time, we find that Adair preserved his <u>Booker</u> objection and that the district court's imposition of his 240-month sentence runs counter to <u>Booker</u>.  "Where, as here, a defendant has preserved a <u>Booker</u> issue in the district court, 'we will ordinarily vacate the sentence and remand, unless we can say the error is harmless under Rule 52(a) of the Federal Rules of Criminal Procedure.'"  <u>Bell</u>, 148 F. App'x at 195 (quoting <u>Mares</u>, 402 F.3d at 520 n.9).  The government does not even contend that the error is harmless.  The government has not met its burden of proving beyond a reasonable doubt that the federal constitutional error of which Adair complains did not contribute to the sentence

- 17 -

that he received.  See <u>United States v. Akpan</u>, 407 F.3d 360, 377 (5th Cir. 2005) (citing <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967)); <u>see also</u> <u>Henefield</u>, 143 F. App'x at 587 (noting that the "government concedes that . . . [the defendant's] sentence was not harmless error because the district court would have imposed a lesser sentence under an advisory Sentencing Guidelines scheme") (internal quotation marks and citation omitted). Accordingly, we vacate Adair's sentence and remand for resentencing pursuant to <u>Booker</u>.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM Adair's conviction, VACATE his sentence, and REMAND for resentencing consistent with the Supreme Court's decision in <u>Booker</u>.