**UNITED STATES of America,**

v.

**Robert A. GEORGE, Defendant.**

**Criminal No. 11–10201–NMG.**

United States District Court,
D. Massachusetts.

March 9, 2012.

---

Robert M. Goldstein, Boston, MA, Kevin J. Reddington, Law Offices of Kevin J. Reddington, Brockton, MA, for Defendant Robert A. George.

Zachary R. Hafer, James D. Herbert, Laura Kaplan, United States Attorney's Office, Boston, MA, for Plaintiff USA.

## MEMORANDUM & ORDER

NATHANIEL M. GORTON, District Judge.

On April 7, 2011, a seven-count Indictment was returned charging Robert A. George ("George") with Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h) (Count I), Money Laundering, in violation of 18 U.S.C. § 1956(a)(3) (Counts II–VI) and Structuring Transactions to Evade Reporting Requirements, in violation of 31 U.S.C. § 5324(a)(1) (Count VII).

Currently before the Court are the following motions filed by defendant: 1) Motion to Dismiss Count One, 2) Motion for Production of Legal Instructions to Grand Jury and to Dismiss Absent Adequate Legal Instructions and 3) Motion to Dismiss the Indictment.

## I. *Background*

George, an attorney practicing in Massachusetts, is charged with conspiring to launder drug proceeds and laundering drug proceeds at various times between February, 2009 and March, 2011. George allegedly collaborated with Michael Hansen ("Hansen") to launder the illicit proceeds provided by a confidential informant ("CW") working with the Drug Enforcement Agency ("DEA"). Later, George and the CW allegedly entered into a fee-splitting arrangement whereby George paid the CW a 10% commission for client referrals.

According to the criminal complaint, the investigation arose in February, 2009 when, shortly after being released from prison, the CW contacted Special Agent Joseph Tamuleviz ("SA Tamuleviz"), a DEA agent he had worked with in the past. The CW reported to SA Tamuleviz that, during a "chance encounter" with George at the South Shore Plaza, George inquired into whether the CW was still in possession of proceeds from a prior larceny case involving over $700,000. When the CW answered in the affirmative, George allegedly offered to put him in touch with Hansen, who could launder the money through his mortgage company, East Coast Mortgage Company.

Shortly after receiving that information from the CW, SA Tamuleviz relayed the information to Assistant United States Attorney Laura Kaplan, who was also familiar with the CW from a previous investigation. The investigation of George was officially opened by the DEA on March 18, 2009.

The government proceeded to build its case against George through a series of arranged in-person meetings and consen-

sually recorded telephone conversations between the CW, George and Hansen. Through the course of those communications, the CW purportedly told both Hansen and George that he had large amounts of cash from cocaine trafficking. It is alleged that on two separate occasions, once in December, 2009 and once in April, 2010, the CW provided Hansen with $100,000 in cash in exchange for two $80,000 checks payable to a fictitious DEA company. The checks were written on behalf of Hansen's mortgage company so that they would appear to be loans to the CW. Hansen allegedly kept $40,000 as commission.

When Hansen was confronted by law enforcement officials in June, 2010 and informed that he was the target of the undercover money laundering investigation, he agreed to become a cooperating witness against George. Shortly thereafter, he arranged a meeting with George and paid him $20,000 in cash, purportedly as a fee for George's assistance in the transactions with the CW.

The indictment also alleges that, in February, 2011, George offered to pay the CW a fee for client referrals. In response, the CW introduced George to an undercover DEA task force agent ("the undercover agent") posing as a Dominican drug dealer. It was ultimately confirmed that George would represent the undercover agent's drug organization, and the undercover agent paid George $25,000 in cash as a retainer fee. The same day he received the cash, George deposited $17,000 into his bank account in two different transactions: one $9,000 deposit into his Bank of America account at a branch in Needham and a second $8,000 deposit made ten minutes later into the same account at a branch in Chestnut Hill. Two weeks later, George gave the CW a check for $2,500 made payable to the fictitious DEA company.

In the memorandum section of the check, he wrote "office disposal".

Pursuant to the foregoing allegations, the indictment charges George with seven criminal counts. The first count is for conspiring with Hansen between February, 2009 and June, 2010 to conceal the illicit source of drug proceeds. The second and third counts are money laundering counts based on George's aiding and abetting of the two separate $100,000 transactions between the CW and Hansen. The fourth and fifth counts are money laundering counts based on George's two separate deposits of the cash he received from the undercover agent as a retainer fee. The sixth count is a money laundering count based on the $2,500 fee George paid to the CW. The seventh count is a structuring charge for the $17,000 that George deposited into his account at two different Bank of America branches.

George contends that the government's case against him was initiated and pursued in retaliation for his involvement in a criminal case in which his client discussed with a fellow inmate (turned government informant) the possibility of murdering an Assistant United States Attorney. By improperly targeting him for prosecution, George contends, the government engaged in outrageous misconduct and/or vindictive prosecution and thus violated his Fifth Amendment right to due process. George therefore moves to dismiss the indictment. Additionally, on separate legal bases, George has moved to dismiss the conspiracy count (Count I) and to compel production of the legal instructions given to the grand jury.

## II. *Analysis*

### A. **Legal Standard**

 "In the normal course of events, a facially valid indictment returned by a

duly constituted grand jury calls for a trial on the merits." *United States v. Stokes,* 124 F.3d 39, 44 (1st Cir.1997). An indictment is generally sufficient if it

> sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense.

*United States v. Guerrier,* 669 F.3d 1, 3 (1st Cir.2011); *see also Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

■ In contrast to civil actions, an indictment generally is not subject to dispositive motion practice. *See United States v. Li,* 206 F.3d 56, 62 (1st Cir.2000) (quoting *Stokes,* 124 F.3d at 44) ("[D]ismissing an indictment is an extraordinary step."). Indeed, the First Circuit has observed that a federal court using its supervisory power to dismiss an indictment "directly encroaches upon the fundamental role of the grand jury." *Whitehouse v. U.S. Dist. Ct. For Dist. Of RI,* 53 F.3d 1349, 1360 (1st Cir.1995). Thus, that power is appropriately reserved for "extremely limited circumstances." *Id.*

### B. Motion to Dismiss Count I

Count I charges George under 18 U.S.C. § 1956(h) with conspiring to launder money in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 1957. The conspiracy provision, § 1956(h), provides that

> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

The first substantive provision, § 1956(a)(1)(B)(i), makes it a crime to conduct knowingly a financial transaction which "in fact" involves the proceeds of "specified unlawful activity" and is de-signed to conceal the nature of those proceeds. The second substantive provision, § 1957, penalizes a person who knowingly engages in a monetary transaction involving criminally derived property worth more than $10,000. Count I, along with the remaining charges, is premised on the "specified unlawful activity" of narcotics trafficking and wire fraud.

Both of the substantive provisions charged as objects of the defendant's conspiracy criminalize money laundering that involves actual illegal proceeds. By contrast, § 1956(a)(3) criminalizes money laundering pursuant to undercover "sting" operations in which the illegal proceeds are in fact government funds but are "represented" to derive from unlawful activity by law enforcement officers or those acting under their direction. *United States v. Castellini,* 392 F.3d 35, 45 (1st Cir.2004) ("The 'sting' portion of the money laundering statute means that the 'proceeds' can be part of a fiction the government creates."). The sting provision was added in 1988 to eliminate the "impossibility defense" that had been accepted by some circuit courts, i.e., that it was "impossible to 'know' that funds were illegally derived if they were not in fact unlawful, but rather government-supplied sting funds." *United States v. Berrio,* 77 F.3d 206, 209 (7th Cir.1996); *see also* 134 Cong. Rec. S17360–02 (1988).

■ Defendant contends that because none of the proceeds in the relevant financial transactions were "in fact" proceeds of specified unlawful activity but were instead "sting" proceeds that the government provided to its cooperating witness, the government should have charged him with conspiring to violate § 1956(a)(3). Defendant acknowledges that a conspiracy is merely an agreement and that the government generally need not prove the ele-

ments of the underlying offenses to establish the elements of conspiracy but argues that the conspiracy charge should be dismissed because it is "incongruous at best" to charge §§ 1956(a)(1)(B)(i) or 1957 as objects of the conspiracy of a sting operation after the money laundering statute was specifically amended to include the sting provision.

■ Any "incongruity" that may exist, however, does not warrant the extraordinary step of dismissal. As defendant concedes, the crime of conspiracy to commit money laundering is indeed independent from the crime of actually committing money laundering and the conspiracy charge need not include the elements of the substantive offense. *See Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) ("[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses."); *United States v. Threadgill*, 172 F.3d 357, 367 (5th Cir. 1999) ("[A] conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit."). Conspiracy requires proof that an agreement existed to commit the underlying substantive offense which the defendant knew of and elected to participate in. *United States v. Gomez–Rosario*, 418 F.3d 90, 105 (1st Cir.2005). Specifically,

> [T]o establish that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent: intent to agree [with co-conspirators] and intent to commit the substantive offense.

*United States v. Llinas*, 373 F.3d 26, 30 (1st Cir.2004) (quoting *United States v. Gomez–Pabon*, 911 F.2d 847, 852–53 (1st Cir.1990)).

As applied to § 1956(h), the government must prove only that a defendant voluntarily entered into an agreement to launder illicit funds intending that they be so laundered, regardless of whether the subject funds were actually illicit or were only represented to be so by the government. *United States v. Adair*, 436 F.3d 520, 525 (5th Cir.2006) (holding that conspiracy to commit money laundering does not require proof that funds were actually derived from unlawful activity); *see also United States v. Monea*, No. 1:07CR30, 2008 WL 731100, at *10–11 (N.D.Ohio Mar. 17, 2008), *aff'd* 376 Fed.Appx. 531 (6th Cir. 2010) (same).

■ It is not, as defendant contends, anomalous that the government must prove that the defendant knew the funds involved were proceeds of illegal activity when, in reality, they were not because conspiracy is a crime of intent that is not negated due to factual impossibility. Whether reality is as the conspirator believes simply does not affect his culpability. *United States v. Waldron*, 590 F.2d 33, 34 (1st Cir.1979) ("[A] culpable conspiracy may exist even though, because of the misapprehension of the conspirators as to certain facts, the substantive crime which is the object of the conspiracy may be impossible to commit."); *see also United States v. Turner*, 501 F.3d 59, 70 (1st Cir.2007) ("While the substantive crime that is the object of the conspiracy may be impossible to achieve, the conspiracy nonetheless qualifies as an offense for which a person may be prosecuted.").

The government therefore had the discretion to charge §§ 1956(a)(1)(B)(i) and 1957 as objects of the alleged conspiracy, and the defendant's motion to dismiss Count I will be denied.

### C. Motion for Production of Legal Instructions to Grand Jury

George next requests this Court to order the Government to produce the legal

instructions provided to the grand jury and to dismiss the indictment absent evidence of appropriate legal instructions.

■ "The Supreme Court has repeatedly recognized the importance of secrecy in grand jury proceedings even after ... the grand jury has concluded its function." *United States v. McMahon,* 938 F.2d 1501, 1504 (1st Cir.1991) (citing *Douglas Oil Co. v. Petrol Stops Nw.,* 441 U.S. 211, 222, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)). In appropriate circumstances, however, a Court has discretion pursuant to Fed. R.Crim.P. 6(e)(3)(E) to pierce the secrecy of the grand jury and authorize disclosure of a grand jury matter

> at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.

That provision is not an invitation to engage in "fishing expeditions" for misconduct in grand jury proceedings "when there are no grounds to believe that any wrongdoing or abuse has occurred." *United States v. Rodriguez–Torres,* 570 F.Supp.2d 237, 241 (D.P.R.2008). Rather, a requesting defendant bears the burden of showing a "particularized need" for the requested material, that is, that 1) the material sought is needed to avoid a possible injustice in another judicial proceeding, 2) the need for disclosure outweighs the need for continued secrecy and 3) the request is structured to cover only what is needed. *Douglas Oil Co.,* 441 U.S. at 222, 99 S.Ct. 1667; *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).

■ Defendant here has failed to carry his burden. Although he requests production of all legal instructions provided to the grand jury, he posits only that there is a potential defect in the legal instructions provided on the conspiracy charge, Count I, insofar as a reading of that count would not apprise the grand jury of all the legal elements needed to establish criminal conspiracy. In particular, he contends that a jury would be unaware that 1) the "agreement" element is not satisfied "by mere knowledge of an illegal activity" or "mere association with other conspirators", *see United States v. Dellosantos,* 649 F.3d 109, 115 (1st Cir.2011), or 2) that he must have intended along with his co-conspirator to commit the underlying offense, *see United States v. Llinas,* 373 F.3d 26, 30 (1st Cir. 2004). He concludes that the government was obligated to provide separate, particularized instructions on those aspects of conspiracy and that if it did not, or if its instructions were inadequate, the count is deficient and must be dismissed.

The Court disagrees. Whether or not defendant's construction of the government's obligation has merit, his suggestion of impropriety does not because the plain words of the conspiracy charge were sufficient to apprise the jury of the necessary legal elements, including George's intent to form an agreement and intent to commit the underlying offense. Count I charges him with "knowingly and intentionally" combining, conspiring, confederating and agreeing with other persons 1) to conduct and attempt to conduct a financial transaction that he knew involved illegal proceeds and was designed, at least in part, to conceal the nature of those proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and 2) to engage and attempt to engage in a monetary transaction in what he believed to be criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. § 1957.

The grand jury could not have charged George under that Count without having found probable cause to believe that an agreement existed between George and at least one other individual to accomplish the specified illegal purposes. There is thus

no basis for George's speculation of impropriety and no looming potential for injustice. The motion to produce legal instructions or to dismiss the indictment will therefore be denied.

### D. Motion to Dismiss the Indictment

Finally, defendant moves to dismiss the indictment in its entirety on the grounds that the government has engaged in outrageous misconduct and/or vindictive prosecution in initiating and pursuing the case against him.

#### 1. Extreme and Outrageous Conduct

■■■ "In rare and extreme circumstances, a federal court has the authority to dismiss criminal charges as a sanction for government misconduct." *United States v. Guzman*, 282 F.3d 56, 59 (1st Cir.2002). That power must be used "sparingly", however, and is "reserved for only the most appalling and egregious situations." *Id.* (citing *United States v. Santana*, 6 F.3d 1, 10 (1st Cir.1993) ("Potential elixirs should not be casually dispensed.")). A defendant invoking an outrageousness defense therefore has a high hurdle to surmount; indeed, although the First Circuit has confirmed the theoretical viability of the defense, it has never dismissed criminal charges on the basis of outrageous government misconduct. *United States v. Luisi*, 482 F.3d 43, 59 (1st Cir. 2007) (citing cases); *Santana*, 6 F.3d at 4 ("The banner of outrageous misconduct is often raised but seldom saluted.").

■■■ A defendant claiming government misconduct must demonstrate that the government has engaged in conduct "so appalling and egregious as to violate due process by 'shocking ... the universal sense of justice.'" *Luisi*, 482 F.3d at 59 (quoting *United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)). Neither the Supreme Court nor the First Circuit has foreclosed the possibility that such a showing may be made where the defendant demonstrates that the government was

> so overinvolved in a felonious venture that [it] can fairly be said to have created the crime or to have coerced the defendant's participation in it.

*Santana*, 6 F.3d at 5 (internal quotation omitted) (noting that some circuits have recognized an outrageousness defense based on government inducement); *see also, e.g., United States v. Capelton*, 350 F.3d 231, 243 n. 5 (1st Cir.2003) (assuming without deciding that an outrageousness defense based on government inducement is available but rejecting it on the facts); *United States v. Nunez*, 146 F.3d 36, 38 (1st Cir.1998) (same). *But see, e.g., United States v. Tucker*, 28 F.3d 1420, 1428 (6th Cir.1994) (holding that a defendant whose defense sounds in inducement is limited to the defense of entrapment); *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir.1995) (holding that the defense of outrageous conduct does not exist in the Seventh Circuit).

■■■ Assuming the defense is available, outrageous misconduct based on government inducement of crime functions as a "supplement" to an entrapment defense. *Santana*, 6 F.3d at 5. As opposed to the defense of entrapment, however, which looks to the defendant's state of mind and criminal propensities, the defense of outrageous conduct looks to the government's conduct with respect to the charged offense and asks whether it "falls below standards, to which common feelings respond, for the proper use of governmental power." *Russell*, 411 U.S. at 441, 93 S.Ct. 1637 (Stewart, J., dissenting) (quoting *Sherman v. United States*, 356 U.S. 369, 382, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)). While entrapment presents an issue of fact, outrageous misconduct based on gov-

ernment inducement presents a defense at law appropriately decided on a motion to dismiss. *United States v. Towne*, 705 F.Supp.2d 125, 136 (D.Mass.2010).

■ Here, defendant claims that the government engaged in outrageous misconduct by manufacturing the case against him "from whole cloth". According to defendant, he was targeted for prosecution and the government decided, without evidentiary support, to charge him with conspiring with Hansen and with aiding and abetting the transactions between Hansen and the CW.

In support of his contention that he was targeted for prosecution, George presents evidence that his initial meeting with the CW in January, 2009 was not a "chance encounter" as stated by SA Tamuleviz in his affidavit in support of the criminal complaint against George. Instead, defendant asserts that

1) the CW had telephoned George's law office several times seeking a meeting,

2) once the investigation was formally initiated, the CW failed to record a substantial number of conversations between the two of them,

3) rather than charge Hansen, whose contacts and actions with the CW were far more robust than George's, the government chose to use Hansen as a cooperating witness to further its case against George, and

4) the government continued to pursue him by having the CW introduce him to the undercover agent who posed as a drug dealer in need of legal representation.

Although evidence of prior phone calls from the CW to George's law office presents some evidence that the CW was seeking George out, the defendant has presented no evidence that he did so at the government's behest. The Court declines to lend credence to George's mere speculation of prior government involvement. Furthermore, even if the government had initiated contact with George, there is insufficient evidence to suggest that it "engineer[ed] and direct[ed] the criminal enterprise from start to finish." *See United States v. Mosley*, 965 F.2d 906, 911 (10th Cir.1992). Instead, there is evidence that George put the CW in touch with Hansen, offered to facilitate transactions and expected to receive a share of the proceeds. *See United States v. Harris*, 997 F.2d 812, 816 (10th Cir.1993) (no outrageous misconduct where government initiated drug transaction, and acted as buyer and seller, but defendant arranged and directed it); *United States v. Bradley*, 820 F.2d 3, 7 (1st Cir.1987) ("[A] defendant may be barred from claiming outrageousness if he has been too active himself."). *But see United States v. Twigg*, 588 F.2d 373, 380–81 (3d Cir.1978) (outrageous misconduct found where government established, stocked and ran an illegal drug laboratory).

Nor is it outrageous that George had numerous conversations with the CW that were not recorded. Given the inevitable variables that accompany criminal investigations and the reality of scarce resources and personnel, the First Circuit has declined to adopt an "all-or-nothing" rule with respect to the recording of conversations in sting operations. *United States v. Chaudhry*, 850 F.2d 851, 857 (1st Cir. 1988); *see also United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir.1986) ("While there is [a due process] obligation to preserve recordings once they have been created, there is no general duty to make recordings in the first place."). Indeed, the calculus is especially complicated when the government uses a confidential informant because assessment of an informant's

credibility is a task for the jury. As the Seventh Circuit has explained,

> credibility determinations regarding an informant belong to the jury, not the court, and ... it [is] equally important to consider the total circumstances of the undercover operation in assessing the supposed outrageousness of the government's conduct. In conducting criminal investigations, law enforcement frequently must rely on unsavory characters ... whose motives are less than pure. As with all due process analyses, the touchstone consideration is whether the proceeding was fundamentally fair, and selective recording without more does not offend the Constitution.

*United States v. Andreas,* 216 F.3d 645, 658–59 (7th Cir.2000) (citing *Chaudhry,* 850 F.2d at 857); *see also Labensky v. Cnty. of Nassau,* 6 F.Supp.2d 161, 176 (E.D.N.Y.1998) (noting that selective recording presents "proof" and "evidence-gathering" problems).

Here, the record does not support a conclusion that the allegedly selective recording, either standing alone or in combination with other evidence, amounted to outrageous misconduct. There is no objective evidence that the recordings were made in bad faith or that any unrecorded conversations would have been exculpatory. At trial, the defendant will be able to probe the CW's credibility and explore the significance (if any) of his or her failure to record certain conversations.

The Court also declines to draw any negative inference from the fact that the government used Hansen as an informant rather than charge him with money laundering. Generally, pretrial charging decisions involve a multitude of "tangible and intangible" considerations and are not "readily susceptible to the kind of analysis the courts are competent to undertake." *Town of Newton v. Rumery,* 480 U.S. 386,

396, 397 n. 7, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) ("[T]he complexity of pretrial decisions by prosecutors suggests that judicial evaluation of those decisions should be especially deferential."). Here, there is no evidence upon which to conclude that animus against George, rather than, for example, an objective assessment of the strength and importance of each case, motivated the government's charging decisions. *See Sanders,* 211 F.3d at 719 (2d Cir.2000) ("It is precisely the responsibility of the prosecutor to weigh 'the societal interest in prosecution' against the potential benefits from a defendant's cooperation.").

Finally, although George contends that the meeting the CW arranged between him and the undercover agent in early 2011 is further evidence of the government's determination to ensnare him, the Court notes that the meeting occurred only after George had asked the CW to refer him business and arrange the meeting. Under such circumstances, George can hardly claim that the government manufactured or contrived the charges that ensued.

The second basis of George's outrageous misconduct defense is his claim that the government persisted in the investigation against him despite a paucity of evidence. In support, George directs the Court's attention to the fact that: 1) there was a telephone conversation between him and the CW on December 7, 2009 in which he stated he did not want to be involved in the transaction between the CW and Hansen, 2) he did not speak to the CW between December 7, 2009 and April 26, 2010, 3) he did not speak to Hansen, his only alleged co-conspirator, between April, 2009 and July, 2010, 4) he was not present at and did not participate in either of the two transactions and 5) Hansen has repeatedly told the government in proffer

sessions, before and after George's arrest, that Hansen did not believe the funds came from illegal activity.

While it is conceivable that such evidence may raise a colorable entrapment defense at trial, that evidence does not support a motion to dismiss based on outrageous misconduct. First, Hansen's state of mind presents an issue of fact for the jury. Second, George's absence from the January and April, 2010 financial transactions and the extended hiatus in recorded conversations between George and the CW or Hansen prior to those transactions hardly disqualifies George as a potential conspirator or aider and abetter.

Third, although George contends that the December 7, 2009 conversation between him and the CW demonstrates his unwavering resolve not to be involved in the financial transactions between the CW and Hansen, he had, in prior conversations, offered his direct services to facilitate the transaction. Furthermore, one could fairly construe the conversation on December 7, 2009 as proof that George simply did not want an $80,000 check made payable to himself personally unless he talked with Hansen first. Finally, subsequent conversations reveal that George was wary of talking shop over the phone and perhaps may have intermittently communicated his reluctance to be involved in any illegal schemes out of an abundance of caution. In sum, George's involvement in and willingness to orchestrate the subject financial transactions between the CW and Hansen presents issues of fact appropriately decided by a jury.

The Court thus concludes that the government did not create the crime for which the defendant is charged or unreasonably pursue an investigation when faced with a dearth of evidence. Defendant's motion to dismiss on the basis of outrageous misconduct will therefore be denied.

## 2. Vindictive Prosecution

A prosecutor enjoys broad discretion in determining whom to prosecute for what crime, and such pretrial charging decisions are presumed to be legitimate. *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). Even so, a prosecutor runs afoul of due process when he penalizes an individual for exercising a statutory or constitutional right. *United States v. Jenkins,* 537 F.3d 1, 3 (1st Cir.2008); *see United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." (internal quotation omitted)). Accordingly, an indictment may be dismissed upon sufficient proof of vindictiveness. *United States v. Sanders,* 211 F.3d 711, 716 (2d Cir.2000).

To establish prosecutorial vindictiveness, a defendant must show that the prosecutor harbored genuine animus toward him and that he would not have been prosecuted but for that animus. *United States v. Wilson,* 262 F.3d 305, 314 (4th Cir.2001); *Sanders,* 211 F.3d at 717. A defendant who lacks direct evidence of a vindictive motive can establish a rebuttable presumption of vindictiveness by demonstrating circumstances that reveal a sufficient likelihood of vindictiveness. *Jenkins,* 537 F.3d at 3.

Raising such a presumption is especially difficult in a pretrial setting, however, given that a prosecutor is afforded broad discretion to determine whom should be prosecuted and for what crime and is presumed to have exercised that discretion in good faith. *United States v. Bucci,* 582 F.3d 108, 112 (1st Cir.2009); *United States v. Stokes,* 124 F.3d 39, 45 (1st Cir.1997) ("[C]ourts should go very slowly in embracing presumptions of prosecutorial vin-

dictiveness in pretrial proceedings."); *see also United States v. Cooper,* 461 F.3d 850, 856 (7th Cir.2006) (the "presumption of vindictiveness does not apply to pretrial decisions by the prosecution"); *Wilson,* 262 F.3d at 315 ("[T]he presumption of vindictiveness ... will rarely, if ever, be applied to prosecutors' pretrial decisions."); *Sanders,* 211 F.3d at 717 ("A presumption of vindictiveness generally does not arise in a pretrial setting.").

■ Even to obtain discovery, a defendant must present "some" objective evidence tending to show the existence of prosecutorial vindictiveness. *Bucci,* 582 F.3d at 113. The standard is a "rigorous" one because

> examining the basis of prosecution delays criminal proceedings, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Sanders,* 211 F.3d at 717 (citing *United States v. Armstrong,* 517 U.S. 456, 465, 468, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)); *see also Wilson,* 262 F.3d at 315.

■ Defendant here offers no direct evidence of prosecutorial animus but rather contends that there are serious reasons to question whether the government initiated and pursued the investigation against him in retaliation for his involvement in a criminal case initiated in 2006, *United States v. James Bunchan,* 06–10004–RGS. As further indicia of vindictive prosecution, George contends that 1) SA Tamuleviz's affidavit in support of the criminal complaint contained numerous false and/or misleading statements, 2) the government improperly arrested him at his home rather than serve him with a summons and 3) the government's supervision of the CW was inadequate.

In the *Bunchan* case, George defended James Bunchan ("Bunchan"), who was charged with perpetrating a Ponzi pyramid scheme. While the fraud charges were pending, Bunchan attempted to hire someone to kill the people whom he expected to testify against him at trial. He was also heard on prison telephones, and in recorded conversations with an FBI informant, 1) discussing the possibility of having then-Assistant U.S. Attorney Jack Pirozzolo, the lead prosecutor, and his family murdered and 2) claiming that George was holding diamonds, jewelry and/or cash for him that would be used to pay the "hit man" upon proof that the killings had occurred.[1] Bunchan was indicted for the murder plot while the fraud case was pending and, after he was convicted and sentenced for fraud before one judge of this Court, he was convicted and sentenced for the murder plot before another.

The government apparently suspected that George was holding forfeitable assets for his client because, at one point during the pendency of the fraud case, it served George with a subpoena regarding his receipt or holding of Bunchan's jewelry and/or cash.[2] Ultimately, the subpoena was withdrawn.

Now, in connection with his motion to dismiss in this case, defendant submits two affidavits from Attorney James Dilday, who represented Bunchan's wife and co-defendant in the fraud case, Seng Tan. In the first affidavit, Mr. Dilday reports that in April, 2011, he spoke with Assistant United States Attorney Laura Kaplan, who explained that she was lead counsel in

---

**1.** Mr. Pirozzolo became Acting First Assistant United States Attorney in November, 2009.

**2.** The Court has not been provided with a copy of the subpoena, the motion to quash or the government's opposition.

the prosecution of George for money laundering and was conducting a continuing grand jury investigation into his behavior. According to Mr. Dilday, Ms. Kaplan stated that she was in a position to offer Ms. Seng a reduction in sentence if Ms. Seng could confirm that George was holding forfeitable assets for Bunchan. During the conversation, Ms. Kaplan purportedly stated that it was "Jack's idea" to approach Mr. Dilday because he thought "there was probably something there" and that she was "taking her orders from the front office." Mr. Dilday states that he informed Ms. Seng of the offer but that Ms. Seng replied that she could offer no information incriminating George.

In the second affidavit, Mr. Dilday reports that in June, 2011 he spoke with Attorney Joshua Gordon, who represented Ms. Seng in her appeal, regarding a conversation Mr. Gordon had with Mr. Pirozollo. Mr. Pirozollo had allegedly called Mr. Gordon to inform him of the same sentence-reduction offer for Ms. Seng. Mr. Pirozollo then purportedly stated that he had received a letter from Ms. Seng which was inconsistent with what Mr. Dilday had told Ms. Kaplan back in April, and that he (Pirozollo) intended to meet with Ms. Seng with or without Mr. Gordon's authorization.

Based upon those affidavits, George contends that Mr. Pirozzolo has played some role in the investigation and/or prosecution of his case. He contends that such involvement is evidence of a serious conflict of interest within the United States Attorney's Office and supports the proposition that the indictment against him is the product of vindictiveness.

In response, the government has submitted a second affidavit from SA Tamuleviz which reiterates that the investigation was initiated based upon information provided to him by the CW in early 2009, which he subsequently relayed to Ms. Kaplan. SA Tamuleviz states that 1) he has worked exclusively with Ms. Kaplan and James Herbert, the other lead prosecutor, throughout the investigation and prosecution of George, 2) he had no role in, and has no knowledge of, the *Bunchan* case and 3) he has never spoken with Mr. Pirozzolo about this case or any other matter.

The government has also submitted an affidavit from Ms. Kaplan in which she states that the case was opened after she received the information relayed by SA Tamuleviz and that Mr. Pirrozolo has had no involvement in the investigation or prosecution. Mr. Pirozzolo's only involvement, she states, was 1) a third-round review of the prosecution memorandum and indictment in his capacity as the Acting First Assistant United States Attorney and 2) participation in internal office discussions in April, 2010 related to George's potential conflict of interest in the continued representation of other defendants in the courthouse. In July, 2010, Mr. Pirozzolo, together with Criminal Chief Lang, appeared before Judge Young to apprise him of the government's investigation and the potential conflict of interest.

The Court concludes that the defendant has failed to carry his burden of establishing a likelihood of prosecutorial vindictiveness or even "some" objective evidence thereof that would warrant discovery. To obtain discovery would require George to "do more than simply identify a potential motive for prosecutorial animus." *Bucci*, 582 F.3d at 114. Instead, he would have to connect any such animus "to those making the challenged charging decisions in his case." *Id.*; *see also Sanders*, 211 F.3d at 718 ("To warrant discovery, the defendant must show some evidence of genuine animus, not the mere possibility that animus might exist under the circumstances.").

George has failed to show any evidence of animus. There simply has been no showing from Mr. Dilday's affidavits that the *Bunchan* case, or Mr. Pirozzolo, had any effect on the federal prosecutors' decision to bring the money laundering charges at issue in this case. Furthermore, use of those affidavits permeated with hearsay to prove facts upon which defendant's constitutional defense rests is dubious at best.

In any event, the question of method of proof is academic because the affidavits do not establish facts which support his motion to dismiss. To the contrary, all signs indicate that the government's decision to prosecute George rested on evidence uncovered during its covert investigation. Notably, the conversations described by Mr. Dilday in his affidavit were conducted after the indictment for money laundering was entered against George and presumably related to a continuing grand jury investigation. The limited extent of Mr. Pirrozolo's peripheral involvement in the investigation and indictment of George is described in Ms. Kaplan's affidavit and there is not a modicum of evidence to suggest that Ms. Kaplan or Mr. Herbert harbored any animus against George due to his prior representation of Bunchan.

Furthermore, while George may disagree with SA Tamuleviz's characterization of several of the consensually recorded conversations, there is nothing patently false or misleading in the agent's affidavit. Furthermore, neither the manner of George's arrest nor of the government's supervision over the CW was so unusual as to suggest vindictiveness. As discussed above, issues surrounding the CW's selective recording may be probed at trial.

In sum, the Court concludes that George has not demonstrated a likelihood that his prosecution was motivated by a desire to punish him for his role as defense attorney for Bunchan. His motion to dismiss the indictment and for discovery on the basis of vindictive prosecution will therefore be denied.

### 3. Request for an Evidentiary Hearing

 A defendant is not entitled to an evidentiary hearing as a matter of course. Rather, a hearing is required only if a defendant establishes that material facts are disputed and that a hearing would assist the Court in resolving the dispute. *United States v. Colón–Muñoz*, 318 F.3d 348, 358–59 (1st Cir.2003). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

For the reasons stated above, the Court discerns no issue of material fact which must be resolved for the Court to decide defendant's motion to dismiss. Defendant's motion for an evidentiary hearing will therefore be denied.

### ORDER

In accordance with the foregoing, Defendant's Motion to Produce Legal Instructions to Grand Jury and to Dismiss Absent Adequate Legal Instructions (Docket No. 28), Motion to Dismiss Count One (Docket No. 29) and Motion to Dismiss (Docket Nos. 43 and 44) will all be **DENIED** without a hearing.

**So ordered.**